475 So.2d 1071 (1985)
Herbert RODRIGUE, Burton G. Klein and Mary Borrell
v.
Alvin C. COPELAND and Popeye's Famous Fried Chicken, Inc.
No. 85-C-0484.
Supreme Court of Louisiana.
September 10, 1985.
*1072 Cecil M. Burglass, Jr., New Orleans, for plaintiff-applicant.
Peter Butler, New Orleans, for defendant-respondent.
DIXON, Chief Justice[*].
Plaintiffs, three residents of the Pontchartrain Shores Subdivision in Jefferson Parish, instituted this action to enjoin defendant, Alvin C. Copeland, from erecting and operating his annual Christmas display. The plaintiffs sought injunctive relief under C.C. 667-669 due to problems associated with an enormous influx of visitors to their limited access, residential neighborhood.
The preliminary injunction was denied by the trial judge on December 15, 1983. After trial of the permanent injunction, the trial court, on August 31, 1984, denied the permanent injunction, but also ordered the defendant to limit the exhibition to thirty days and to deactivate the display at 11:00 p.m. nightly. Relief was otherwise denied. The court of appeal affirmed the denial of injunctive relief and further held that the trial court's restrictions were not obligatory on the defendant, but were "parameters" within which defendant could "operate", but "if he operates outside of those *1073 parameters, his display could be ... declared a nuisance in fact and, hence, abated." Rodrigue v. Copeland, 465 So.2d 67, 72 (La.App.1985).
Since 1977 defendant has annually maintained a Christmas display on his premises at 5001 Folse Drive. The display has grown in size and popularity since the year of its inception. The display consists of an extravagant array of lights and lighted figures accompanied by traditional Christmas music.
The neighborhood is a limited access area which is zoned solely for single family residences. Defendant's premises, which front on Folse Drive, are bounded to the north by the Lake Pontchartrain levee, to the east by a public right-of-way and to the west by the residence of plaintiff Mary Borrell. (See appendix for map of the neighborhood).
Since 1982 defendant's exhibition has drawn numerous spectators to the neighborhood during the hours while the display is in operation. The spectators view the display either from their automobiles or on foot after parking their vehicles in the surrounding neighborhood. The increased congestion in the neighborhood has created numerous problems for some of the defendant's neighbors such as restricted access to their homes, noise, public urination, property damage and a lack of on-street parking.
The plaintiffs[1] commenced the present action on November 30, 1983. They prayed for an injunction restraining defendant or his agents from erecting or activating the display.
On December 1 the Parish of Jefferson also sought injunctive relief to prevent Copeland from maintaining his display. The parish alleged that defendant was in violation of the Jefferson Parish Code of Ordinances and the Comprehensive Zoning Ordinance. The primary basis for this suit was the alleged presence of decorations and other structures on parish property adjoining 5001 Folse Drive.
The two suits were consolidated and a hearing was set for December 6, 1983. Prior to the hearing, the trial judge visited the site of the display on December 3. On that same day a pretrial conference, attended by counsel and two representatives of the Jefferson Parish Sheriff's Office, was held at the home of the trial judge.
The hearing on the preliminary injunction commenced on December 6, 1983. Harry Lee, the Sheriff of Jefferson Parish, testified that his office had devised a plan which would facilitate a smoother flow of traffic in the neighborhood. The plan was to go into effect each night while the display was in operation. Under the plan, the traffic was to be directed down Transcontinental Drive in a northerly direction toward the display. The right-hand, northbound lane of Transcontinental was to be blocked off and reserved for use by emergency vehicles. Once the automobiles reached the intersection of Folse and Transcontinental, they would be required to turn left on Folse or make a U-turn onto the southbound lanes of Transcontinental. Under the plan, Folse was to be redesignated as a westbound, one-way street and westbound vehicles on Folse were to be permitted to pass in front of the display.
The sheriff testified that the plan would require the services of seven deputies. Two of the deputies were to patrol the Transcontinental neutral ground on horseback while the others were to direct traffic. Two or three portable toilets were to be placed on the neutral ground in order to control the problem of urination on property of nearby residents. Two motor scooters were to be stationed at the site for use in medical emergencies.
The sheriff also testified that residents of the area would be given identification placards which, upon being displayed to on duty deputies, would allow them to obtain access to their homes. In order to combat the litter problem, the sheriff suggested the deployment of prison "trustees" to pick up trash each morning. He also contemplated *1074 the use of a forty passenger bus to transport visitors to and from the display.
Katherine Knight, a practicing pediatrician and director of pediatrics at Charity Hospital, testified that she resides at 4624 Transcontinental, three blocks from the display. She stated that the southbound traffic on Transcontinental was constant and speedy while the exhibition was in operation. She claimed that her driveway had been obstructed by the autos of visitors to the site and she had trouble backing out of her driveway. On one occasion, while she was "on call," it took her an additional thirty minutes to reach Charity Hospital as a result of the traffic. She also complained that her own Christmas displays were stolen and her family was constantly harrassed by people wishing to use the facilities in her home. Finally, she expressed regret that her children were unable to have their friends over during the Christmas season due to the traffic.
The hearing was recessed and continued until December 13. In the interim, on December 10, the plan delineated by the sheriff went into effect. Upon resumption of the hearing on December 13, Colonel Roy Jacobs testified regarding the effectiveness of the plan. He stated that since the plan went into effect, traffic moved more smoothly and there had been no reports of trash or drunkenness. However, according to Jacobs, the traffic was very heavy on Saturday, December 10.
The plaintiffs and two other witnesses testified regarding the damage and inconvenience caused by the display. They testified that the traffic was very heavy even after implementation of the sheriff's plan. Burton Klein and Edward Hernandez both testified that they spent an inordinate amount of time getting home from work as a result of the traffic. Klein testified that the westbound traffic on Folse Drive had been backed up as far as Clearview, thirteen blocks from the display.
According to Hernandez, who resides at 4733 Transcontinental Drive, he has spent fifteen minutes getting out of his driveway during the peak hours of traffic. Klein and Hernandez also testified that they were unable to have friends over or have parties since access to their houses was limited and parking was not available. The witnesses also complained of loud noises from a combination of sources such as the crowd in front of defendant's house, music from his loudspeakers, slamming of car doors and car horns.
Klein testified that the exhibition and the crowds created a "carnival atmosphere." Hernandez stated that in past years vendors had sold cotton candy and Christmas trinkets at the display site. Borrell, Copeland's next door neighbor, stated that she can hear defendant's Christmas music while inside her home.
Roy Easley of 4964 Folse Drive testified regarding a five minute video tape of the display taken by him. The tape, which was admitted into evidence, was taken on Saturday night December 10, Sunday night December 11, and Tuesday morning December 13. The nighttime portions of the video depicted bumper to bumper traffic moving at a very slow pace. The sheriff's plan was in effect at the time of the video as is evidenced by the presence in the video of a portable toilet and mounted deputies, both located on the neutral ground of Transcontinental.
The defendant testified that the display is normally activated in early December and it is dismantled on or about January 5. The display is activated at dusk and it normally remains in operation until 11:00 p.m. on weekdays and 12:00 o'clock midnight on weekends. He admitted that on occasion the display may have been activated past midnight. During the past few years, the display's cost of $30,000 to $50,000 has been borne entirely by defendant's business, A. Copeland Enterprises, Inc.
Defendant called five residents of the neighborhood who testified that the display was not unpleasant and the traffic situation was much improved since institution of the sheriff's plan. Ben Montalbano of 4924 Folse Drive testified that the heavy traffic lasted for only one hour. He claimed that prior to institution of the traffic plan he *1075 was concerned about the traffic, but that his apprehensions had been allayed by the plan. Rosemary Wyman of 4920 Folse testified that she was in favor of the display, but on cross-examination she admitted that the traffic on Transcontinental was backed up beyond West Esplanade on one occasion.
Colonel Jacobs was called back as a witness and he testified that the sheriff's traffic plan was instituted on Saturday, December 10, 1983. He claimed that problems with the plan would be corrected as they became evident. On cross-examination Jacobs testified that the sheriff's responsibility was restricted to traffic control and he was unable to alleviate problems such as the inability of the nearby residents to have their family and friends over during the holidays. Jacobs also stated that the plan was designed to control traffic and that it did not facilitate any reduction in the number of vehicles attracted to the area.
Based on the foregoing testimony, the trial judge denied the request for a preliminary injunction. The court cited C.C. 667-669 and found that the display was a mere inconvenience which was subject to regulation by the "rules of the police." C.C. 669. Plaintiffs sought remedial writs from the court of appeal and from this court, without success.
The trial of the permanent injunction was held on July 31, 1984. The record from the preliminary injunction was admitted into evidence and additional testimony was taken.
Colonel Jacobs testified that under the sheriff's plan, the traffic flowed smoothly. However, he estimated that more vehicles were able to reach the display after the plan went into effect. He also stated that it took three to five days to effectively implement the plan.
Two witnesses testified that the traffic was less of a problem after December 10, 1983. Ben Montalbano stated that he had no trouble backing his car onto Folse Drive. Vicent Maenza stated that the traffic was ninety percent better with the presence of the sheriff's deputies. Defendant offered to produce six additional witnesses who would testify similarly to Montalbano and Maenza, but the trial judge stated that such testimony would add nothing to defendant's case.
Burton Klein, one of the plaintiffs, testified that the sheriff's plan merely exacerbated the existing problem. According to Klein, the noise level was increased due to the presence of the sheriff's deputies who blew whistles and used amplifiers in directing the traffic. Also, he claimed that the noise from the traffic itself was greater because the plan facilitated the passage of more vehicles in front of the display. Finally, he contended that under the plan he did not have greater access to his house nor was he able to leave his home without great inconvenience.
After trial, the court granted limited injunctive relief, directing Copeland to limit his display to thirty days, commencing the first Saturday in December, and ordering him to turn off the display at 11:00 p.m., nightly. The court also permanently enjoined defendant from using the public property adjacent to his premises for any purpose. Injunctive relief was otherwise denied.
All parties except for the Parish of Jefferson appealed. The court of appeal affirmed the district court's denial of injunctive relief. Rodrigue v. Copeland, supra. Furthermore, the court held that the restrictions imposed by the district court on the time and duration of the display did not have the force and effect of a court order. Instead the court concluded that the restrictions were merely "... parameters within which the court would not find the display to be a nuisance in fact." 465 So.2d at 72.
Plaintiffs now seek reversal of the court of appeal judgment. They contend that they are damaged by the display and are therefore entitled to have it abated. Plaintiffs maintain that the sheriff's traffic control plan exacerbates the problem by accelerating the flow of traffic and thereby attracting more traffic to the area. They *1076 also maintain the court of appeal erred in finding that the restrictions imposed by the trial court did not have the force and effect of a court order. Finally, plaintiffs contend that the lower courts erred in failing to find that defendant's display constitutes a commercial use of his premises in violation of the Jefferson Parish Comprehensive Zoning Ordinance.
Defendant argues that his display is, at most, an inconvenience to the plaintiffs. He maintains that he may not be held accountable for damage occasioned by visitors attracted to the display. Finally, defendant argues that any limitation upon his display would be unconstitutional since his rights of free speech and religious expression would be abridged.

ISSUES
I. Whether defendant's display constituted a commercial use of his premises such that he is in violation of the Jefferson Parish Comprehensive Zoning Ordinance.
II. Whether plaintiffs are entitled to injunctive relief under the obligations of neighborhood imposed by Civil Code articles 667-669.
III. Whether the imposition of injunctive relief would infringe on defendant's constitutional freedoms of religious expression and speech.

COMMERCIAL USE
Plaintiffs contend that defendant's exhibition constitutes a commercial use of his premises in violation of the Jefferson Parish zoning ordinance. The neighborhood is zoned solely for residential use. Plaintiffs support their allegation with defendant's testimony that the cost of the display, $30,000-$50,000, has been borne by his business, A. Copeland Enterprises, Inc., since 1980. Defendant owns 100% of the stock in A. Copeland Enterprises, Inc. This corporation is the parent company of Popeye's Famous Fried Chicken, Inc.
Richard Tatalluto, the assistant comptroller of A. Copeland Enterprises, testified that the costs of the display are handled as a business expense of the company. He also stated that although he does not prepare the tax returns, he was aware that the company deducted its business expenses for tax purposes. Further support for plaintiffs' allegation is found in Burton Klein's testimony that he had observed, on television, a Popeye's sign which was located in the front yard of defendant's home.
Defendant maintains that his display is not an advertisement, but rather that it is intended simply as his personal expression of the spirit and meaning of Christmas. He contends that he immediately removed a small Popeye's Famous Fried Chicken sign from his front yard on one occasion several years prior to the suit. According to Copeland the sign had been placed upon the premises without his consent by his advertising department and it remained on his premises for just one day.
The Comprehensive Zoning Ordinance for Jefferson Parish[2] generally restricts the use of property zoned "R-1 residential" to non-commercial uses. If defendant's display was primarily intended to promote his commercial enterprises, it would be prohibited.
Our analysis of the facts and law lead us to affirm the lower courts' finding that the display did not constitute a commercial use of defendant's property. Therefore, defendant's *1077 display is not barred by the zoning ordinance.
Although the expenses of the display have been borne by defendant's business, the lower courts reasonably could have concluded that the display was intended primarily for defendant's personal satisfaction. The display is temporary in nature. With the exception of one day, several years prior to this suit, it has not included any reference to his business interests. The evidence does not indicate that the display has been used in any media advertisements of defendant's business. Based on these facts, the lower courts could conclude that the display did not constitute a commercial use of his premises.
OBLIGATIONS OF NEIGHBORHOOD (C.C. arts. 667-669)
Owners of immovable property are restrained in the use of their property by certain obligations. These obligations include the responsibilities imposed by articles 667-669 of the Civil Code:
"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him." C.C. 667.
"Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's [neighbor's] house, because this act occasions only an inconvenience, but not a real damage." C.C. 668.
"If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place." C.C. 669.
These obligations of vicinage are legal servitudes imposed on the owner of property. These provisions embody a balancing of rights and obligations associated with the ownership of immovables. As a general rule, the landowner is free to exercise his rights of ownership in any manner he sees fit. He may even use his property in ways which "... occasion some inconvenience to his neighbor." However, his extensive rights do not allow him to do "real damage" to his neighbor.
At issue in this case is whether Copeland's light and sound display has caused a mere inconvenience or real damage to his neighbors and their right to enjoy their own premises.
In determining whether an activity or work occasions real damage or mere inconvenience, a court is required to determine the reasonableness of the conduct in light of the circumstances. This analysis requires consideration of factors such as the character of the neighborhood, the degree of the intrusion and the effect of the activity on the health and safety of the neighbors.
In the past, this court has borrowed from the common law of nuisance in describing the type of conduct which violates the pronouncements embodied in C.C. 667-669. In Robichaux v. Huppenbauer, 258 La. 139, 150, 245 So.2d 385, 389 (1971), we considered whether a horse stable located in the City of New Orleans could be abated under C.C. 669. We stated the following test:
"Thus noxious smells, rats, flies and noise may constitute an actionable nuisance although produced and carried on by a lawful business, where they result in material injury to neighboring property or interfere with its comfortable use and enjoyment by persons of ordinary sensibilities. McGee v. Yazoo & M.V.R. Co., 206 La. 121, 19 So.2d 21 (1944)." (Emphasis added).
*1078 This test has also been applied by the courts of appeal: McCastle v. Rollins Environmental Services of Louisiana, Inc., 415 So.2d 515, 519 (La.App. 1st Cir.1982) ("... whether the alleged nuisance produces serious or material discomfort to persons of ordinary sensibilities in a normal state of health."). Allen v. Paulk, 188 So.2d 708, 709 (La.App. 2d Cir.1966) ("... whether the alleged nuisance produces such a condition as, in the judgment of reasonable men, naturally produces actual physical discomfort to normal persons of ordinary sensibilities, tastes, and habits.").
Although the common law of nuisance has no binding, precedential value in the courts of this state, that body of law does correspond to some extent with the obligations of neighborhood established by C.C. 667-669. Therefore, the analysis employed by the courts of our sister states has been useful as persuasive authority regarding the application of our law.
In Hero Lands Co. v. Texaco Inc., 310 So.2d 93, 98 (La.1975), we recognized that the prohibitions contained in C.C. 667-669 were not limited to the physical invasion of neighboring premises. According to the court:
"... The damage may well be intrinsic in nature, a combination of facts and conditions which, taken together, do not involve a physical invasion but which, under the circumstances, are nevertheless by their nature the very refinement of injury and damage." (Citations omitted).
Since plaintiffs seek injunctive relief, they must prove irreparable injury in addition to the necessary showing of real damage under C.C. 667-669. C.C.P. 3601; Salter v. B.W.S. Corp., Inc., 290 So.2d 821 (La.1974); Hilliard v. Shuff, 260 La. 384, 256 So.2d 127 (1972). Applying the foregoing principles to this case, we conclude that defendant's display has occasioned real damage, not mere inconvenience, upon plaintiffs. Likewise, we conclude that plaintiffs will be irreparably harmed unless injunctive relief is granted.
Defendant's exhibition constitutes an unreasonable intrusion into the lives of his neighbors when considered in light of the character of the neighborhood, the degree of the intrusion and its effect on the use and enjoyment of their properties by his neighbors.
The record demonstrates that the affected area is a single family residential neighborhood. Access to the neighborhood is restricted to residential streets and Transcontinental Drive, a divided paved thoroughfare which ends at Folse Drive, just to the east of defendant's residence. There is no access to and from defendant's premises from the north since the Lake Pontchartrain levee is located immediately to the rear of the lots fronting on Folse Drive.
The damage suffered by plaintiffs during the operation of defendant's display is extensive, both in terms of its duration and its size. Defendant's display becomes operative in early December and remains in operation until January 5. During this period, plaintiffs are forced to contend with a flow of bumper to bumper traffic through their limited access neighborhood. In addition, they must endure the noise and property abuse associated with the crowd of visitors who congregate near the display.
The display begins operation at dusk each evening and continues until 11:00 p.m. on weekdays and 12:00 midnight on weekends. The display is occasionally operational beyond midnight. While in operation, it features an extravagant display of lights which are located across the front of defendant's residence, on the roof and in the enclosed yard to the west of the residence. Some of the lights comprising the display are shaped into figures such as a star, a reindeer, a snowman, three angels and a depiction of Santa and his reindeer. Lights are also located in the trees and shrubs. In addition to the lights, the display features a tapestry proclaiming "Glory to God in the Highest" and a creche.
Noise emanates from the display and from the visitors. The display is accompanied by traditional Christmas music which is amplified through loudspeakers located on the second floor of defendant's residence. *1079 The music is audible inside the home of Mary Borrell. The plaintiffs also complain of noise emanating from car engines, car horns, the slamming of car doors and police whistles.
The record clearly indicates that traffic in the neighborhood is congested due to the slow progress of vehicles carrying spectators by the display. The traffic has seriously impaired the ability of plaintiffs to gain access to and from their premises. Furthermore, on street parking for plaintiffs or their guests becomes virtually nonexistent. As a result of the traffic congestion and lack of parking, plaintiffs and children of defendant's neighbors cannot have their own Christmas celebrations and gatherings.
Defendant contends that the sheriff's traffic plan has minimized any damage to the plaintiffs. Although the plan has facilitated a smoother (quicker) flow of traffic, the remaining problems still exist. The plaintiffs still experience extended delay in reaching and leaving their premises. The noise associated with the display and the crowds remains. Furthermore, the duration of the display has been unaffected by the plan.
The increased traffic attracted to the display has some impact on the health and safety of the residents. The response time for emergency services is increased due to the traffic congestion. However, the record indicates that this danger was minimized under the sheriff's plan through the creation of an emergency lane on Transcontinental and the presence of two motor scooters to be used in medical emergencies. If the physical health and safety of the plaintiffs had been the only factor to consider, we would not have deemed it necessary to restrain defendant's display. However, in consideration of all the factors, the district court committed clear error in failing to find that plaintiffs suffered damage under C.C. 667-669 and irreparable injury. Likewise, the court of appeal erred in affirming the district court.
Plaintiffs' injury stems from the nature and size of the display which render it incompatible with a restricted access, residential neighborhood. Defendant is enjoined from erecting and operating a Christmas exhibition which is calculated to and does attract an unusually large number of visitors to the neighborhood.
In complying with our order, defendant is specifically enjoined from placing oversized lighted figures, such as the reindeer and snowman, in his yards or upon the roof of his residence.[3] The proper place for these "commercial size" decorations is not within a quiet, residential neighborhood. Defendant is also specifically ordered to reduce the volume of any sound accompanying the display so that it is not audible from within the closest homes of his neighbors.
In limiting his display, the burden is placed on defendant to reduce substantially the size and extravagance of his display to a level at which it will not attract the large crowds that have been drawn to the neighborhood in the past.
Of course, defendant is free to maintain his display unrestricted, at a location which is appropriate. The injunction granted herein is limited to activity at defendant's premises on Folse Drive.

CONSTITUTIONAL ISSUES
Defendant contends that injunctive relief affecting his display would infringe on his constitutional freedoms of speech and religious expression. Defendant places emphasis on the religious character of his display, claiming that the display as a whole is intended as part of his celebration of the birth of Christ. In his brief, defendant emphasizes that his display includes a creche (nativity scene),[4] angels, a religious tapestry and a Star of Bethlehem.
*1080 The First Amendment to the United States Constitution provides:
"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."
The corresponding provisions of the Louisiana Constitution, located in Article 1, §§ 7 and 8 provide:
"Section 7. No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom.
Section 8. No law shall be enacted respecting an establishment of religion or prohibiting the free exercise thereof."
The First Amendment and the constitutional provisions of this state do not guarantee the absolute right to express one's views at any time and in any manner. Reasonable time, place and manner restrictions may be applied to the expression of one's views where a significant governmental interest is served and the restrictions are not based on the content of the views expressed. Heffron v. International Society for Krishna Consciousness, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); Consolidated Edison Co. of New York v. Public Commission of New York, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980).
The restrictions imposed on defendant's display do not contravene his constitutional right to express his beliefs. Our decree merely places reasonable limitations on the size of the display in order to prevent defendant's expression from infringing on the rights of plaintiffs. Plaintiffs' protected rights under C.C. 667-669 justify the limitations on defendant's display.
In consideration of defendant's right of religious expression, he is free to retain the religious symbols which are included in his display, that is, the Star of Bethlehem, nativity scene, religious tapestry and oversized lighted angels. The limitations on defendant's activity do not extend to the content of the display.

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed. Defendant is enjoined from operating his display in a manner which attracts bumper to bumper traffic and extremely large numbers of visitors to his limited access, residential neighborhood.
BLANCHE, J., concurs with reasons.
CALOGERO, J., dissents, would reinstate the judgment of the court of appeal.
*1081 
BLANCHE, Justice (concurring).
I respectfully concur and join with the majority in finding defendant's Christmas display a nuisance. However, this writer would prefer not to tell the defendant what he could or could not display. I would enjoin the entire display, including all of the religious items, and let the defendant proceed at his own risk in the future. It takes no more than a consideration of the feelings and sensibilities of one's neighbors to come up with decorations that do not amount to a nuisance.
NOTES
[*] Honorable Henry L. Yelverton served as Justice Ad Hoc in place of Justice Jack Crozier Watson, recused.
[1] Herbert Rodrigue, Burton G. Klein and Mary Borrell.
[2] The Comprehensive Zoning Ordinance for Jefferson Parish provides, in part:

"SECTION VIISINGLE FAMILY RESIDENTIAL DISTRICTR-1
1. DESCRIPTION:
This district is composed of certain lands and structures having a low density, single family residential character and additional open area where it is desirable and likely that such similar development will occur. Uses are limited to single family residences and such non-residential uses as are intended primarily to provide service to the adjacent neighborhood.
2. PERMITTED USES:
In R-1 Districts only the following uses of property shall be permitted:
A. Single Family dwellings.
..."
An exhaustive list of permissible uses follows the above stated portion of the zoning ordinance. None of the permissible uses, therein listed, appear applicable to the present case.
[3] In deference to defendant's right of religious expression, discussed in the final portion of this opinion, he is permitted to retain the lighted star and angels.
[4] Defendant purchased the nativity figures on December 2, 1983, three days after plaintiffs' suit was filed and one day after suit was filed by the Parish of Jefferson. At trial, he maintained that the figures were not purchased as a result of this lawsuit.