683 So.2d 1319 (1996)
J.W. BARTLETT, et al. Plaintiffs-Appellants,
v.
BROWNING-FERRIS INDUSTRIES, CHEMICAL SERVICES, INC., et al., Defendants-Appellees.
No. 96-218.
Court of Appeal of Louisiana, Third Circuit.
November 6, 1996.
Rehearing Denied January 2, 1997.
*1320 Leonard Knapp, Jr., Raleigh Newman, Donald Wayne McKnight, Lake Charles, for J.W. Bartlett, et al.
Michael A. Chernekoff, Robert M. Contois, Jr., Thomas Michael Nosewicz, New Orleans, John B. Scofield, John Richard Pohorelsky, Lake Charles, for Browning-Ferris Industries and Chemical Services, Inc.
Before DOUCET, C.J., and SAUNDERS and AMY, JJ.
DOUCET, Chief Judge.
The plaintiffs appeal a jury verdict denying their claim for damages allegedly resulting from the negligent operation of a hazardous waste disposal facility in the Willow Springs community near Lake Charles, Louisiana in Calcasieu Parish.
In the mid 1950s, Walter Elkins, Sr. began hauling oil field and industrial waste under the name of Mud Movers, Inc. In 1968, he decided that he needed a disposal site for the waste. He entered a 99-year lease for a site at the Willow Springs community in Calcasieu Parish. The lessors were aware of the type of waste to be dumped at the site. At that time, the property had on it ponds, including a reserve pit, and mud pit and a freshwater pit, remaining from an oil well drilled there at some time previously. After leasing the property, Mud Movers dug more ponds. The ponds were unlined and no testing was done to determine soil permeability. These open ponds were used for the disposal and/or storage of hazardous waste. In 1972, all the stock in Mud Movers was bought by a subsidiary of Browning-Ferris Industries, Inc. (BFI). That subsidiary later merged with Browning-Ferris Industries Chemical Services, Inc. (BFI-CSI). In the late 70s, a deep injection well was put into operation at the site. Waste was disposed of by injecting it into the well. Shortly after that, the operators began to develop a secure landfill for disposal of solids and sludges. By 1980, several older ponds had been closed and a receiving pond, an equalization pond and several mixing pits were in use. The receiving pond and equalization pond were clay lined. The mixing pits were unlined. Use of the mixing pits was discontinued in 1983. In 1984, CECOS International, Inc. (CECOS) began operating the site. By 1988, all waste coming onto the site was put into a tank system. In 1990, the operators of the site to began to phase out the waste disposal facilities at the site. After completion of the plan, all that will remain will be a tank farm system and the deep injection well.
In 1979, the state began regulating the transportation and disposal of hazardous waste. At that time, anyone engaging in those activities had to notify the state of their activities, so that the operation could be granted interim status. Interim status allowed them to continue to operate while undergoing permitting. The notification included the identity of the operator of the facility, the location of the site, what types of waste were being disposed of and the methods of disposal. The state received a notification concerning the Willow Springs site in October 1979. It stated that the site was doing chemical treatment of waste, land filling and injection into a well. It was the state's policy to inspect the site to verify the information in the notification. In February 1980, the Willow Springs facility submitted a Part I application for a hazardous waste disposal permit. Part II was submitted later in 1980. In May 1980, the federal government, through the Environmental Protection Agency (EPA), promulgated regulations concerning hazardous waste. The EPA regulations required that they be notified of the existence of disposal sites by November 1980. The EPA regulations also required submission on a permit application much like that submitted to the state. The permitting process continued over a number of years, during which time the Willow Springs site continued operating under interim status. In approximately 1980, a group of local residents formed a *1321 citizens' committee after becoming concerned about the possibility that emissions or releases from the Willow Springs site into the air and ground water could be causing damage to the local environment and the health of the residents of the area. Because of citizen complaints regarding odors, the state conducted air monitoring at the site and in the area. The citizens' committee asked the state to stay the permitting process while a study of the situation was done. The state provided some funding for the study. The permitting process for the Willow Springs facility was delayed for two years. Changes in regulations during that time required a complete rewriting and resubmission of the permit application in 1984. A permit was issued in 1988. The site operators appealed certain requirements of the permit felt to be redundant. A final permit was issued in December 1991.
In 1980, a number area residents, among them the appellants herein, sued for injunctive relief and for damages against a number of defendants believed to have been involved in the operation of the Willow Springs waste site, asking that hazardous waste disposal activities at the site be enjoined and for damages sustained because of the negligent operation of the site. After many amendments and extensive pretrial proceedings, the case came to trial with J.W. Bartlett and his wife, Roselma Bartlett and Gentry Vincent as plaintiffs and, as defendants, BFI, BFI-CSI, CECOS, and Walter Elkins, Jr., a former manager of the site.
After more than six weeks of trial and three days of deliberation, the jury returned a verdict in response to jury interrogatories finding that:
1. None of the defendants were negligent in their operation of the facility;
2. The operation of the site was a nuisance or an abuse of right within the legal meaning of those terms; and,
3. The plaintiffs sustained no damages arising out of the operation of the facility. The plaintiffs appeal.

ULTRAHAZARDOUS ACTIVITY
We will first consider plaintiffs' allegations regarding ultrahazardous activity. Plaintiffs allege that the trial court erred in failing to grant their motion for directed verdict seeking to have the defendants, BFI-CSI and CECOS found absolutely liable due to their engagement in an ultrahazardous activity. Plaintiffs further allege that the trial court erred in failing to instruct the jury regarding the law regarding liability for ultrahazardous activities and in failing to submit to the jury an interrogatory regarding ultrahazardous activity.
Louisiana courts have imposed absolute liability, i.e. liability without proof of negligence or fault, when harm results from the risks inherent in the nature of certain activities that can cause injury even when conducted with the greatest prudence and care. Such activities have included pile driving, storage of toxic gas, blasting with explosives, and crop dusting with airplanes. Ultrahazardous activities are determined as a matter of policy, after a balancing of claims and interests, a weighing of the risk and the gravity of harm, and the consideration of the individual and societal rights and obligations. Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971).
The Louisiana Supreme Court has noted, however, that ultrahazardous activities involve an actor who is the sole cause of the damage and a victim who seldom has the ability to protect himself. Kent v. Gulf States Utilities Co., [418 So.2d 493 (La. 1982)] supra, (in footnote)
Chandler v. Bunge Corp., 489 So.2d 275, 280 (La.App. 4 Cir.), writ denied, 492 So.2d 1219 (La.1986).
The courts of this state have generally adopted a three-prong test for the determination of the existence of an ultrahazardous activity. The court used that test in Burton v. Conoco Offshore, Inc., 93-599, p. 4-5 (La. App. 5 Cir. 2/9/94), 631 So.2d 1374, 1377, as follows:
Our brothers of the First Circuit implemented the United States Fifth Circuit three-prong test in determining whether an activity is ultrahazardous, to-wit: `(1) the activity must relate to land or some *1322 other immovable; (2) the activity itself must cause the injury, and the defendant must be engaged directly in the injury-producing activity; and (3) the activity must not require substandard conduct to cause injury.' Triplette v. Exxon Corp., supra, [554 So.2d 1361] at 1362 [La.App. 1st Cir.1989] (citing Perkins v. F.I.E. Corp., 762 F.2d 1250, 1267-68 ([5th Cir.]1985)).
We will now review our record facts to determine whether the activity complained of is ultrahazardous. We start with the storage and transportation of drilling fluid additives. The record shows these additives were stored in movable storage drums above ground. Intervenors assert that the additives came from the ground and, therefore, the storage of the additives relates to the land. While there is no objective evidence in the record indicating the source of the additives, the source of the waste is irrelevant. It is the activity of storing and transporting the waste material that is pertinent. The activity of storing the additives above ground in movable drums and the transporting of the additives in trucks does not relate to the land or other immovables.
The more crucial issue in determining whether the transportation of the additives from the drums to the truck was ultrahazardous is whether it could have been safely done. Davenport v. Amax Nickel, Inc., [569 So.2d 23 (La.App. 4th Cir.1990)] supra. If the activity can cause harm despite the exercise of due care, then the activity is ultrahazardous by its nature. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982).
(Emphasis added.)
The record here contains no evidence that a hazardous waste disposal facility cannot be safely operated or can cause harm even where due care is exercised. In fact, all the testimony on both sides suggests that a hazardous waste disposal facility, properly operated according to the rules and regulations propounded by the state and federal government, will not cause harm to the residents of the area in which it is situated. None of plaintiffs' experts suggested that the Willow Springs facility could not be safely operated. Therefore, the evidence does not support a finding that operation of the facility was an ultrahazardous activity. Accordingly, we find no error in the refusal of the trial judge to grant plaintiffs' motion for directed verdict.
Further, considering the lack of evidentiary support for a finding of ultrahazardous activity, we find no abuse of discretion in the trial judge's failure to charge the jury in that regard or it his failure to include a jury interrogatory on that subject.

NEGLIGENCE
The plaintiffs further assert that the jury committed reversible error in failing to find that the facility was negligently operated. However, we pretermit any discussion of the possible negligence of the defendants finding that the plaintiffs failed to carry their burden of proving damages.
The record is completely lacking in evidence of any physical injury caused to any of the plaintiffs by any activity of the facility. "[I]n a suit for damages, it is the plaintiff's burden to prove the damage he suffered because of defendants' fault, and to support an award there must be evidence in the record." Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081, 1092 (La.1983). The plaintiffs, however, claim that they are entitled to damages for fear of cancer. The jurisprudence establishes that there is a cause of action available to those who develop a fear of cancer due to the negligence of another. See Straughan v. Ahmed, 618 So.2d 1225 (La.App. 5 Cir.), writ denied, 625 So.2d 1033 (La.1993). However, the evidence of record does not support the conclusion that the plaintiffs herein did, in fact, fear cancer. Mr. Gentry Vincent specifically testified that he had no fears because of living in his house on property that adjoins the facility. While Mrs. Bartlett testified that she fears cancer because of the proximity of her home to the site, she admitted that she never discussed this fear with her doctor although she had consulted him for a variety of illnesses unconnected to her claims herein. She admitted that she did not have a fear of cancer before discussing the site and the *1323 chemicals present there with her attorney. In a deposition taken before trial, she stated that she had a fear of health problems but no specific fear of cancer. Mr. Joseph Bartlett testified that he refuses to have a fear of cancer. Therefore, the plaintiffs have not carried their burden of proving that they feared cancer because of the operations at the facility.
Finally, the plaintiffs claim that they incurred a loss of property value because of the presence of the site and its negligent operation. Robert Diamond, a real estate broker and appraiser, testified for the plaintiffs concerning real estate values. After conducting an analysis of real estate sales in the area affected by the site as compared with sales in areas unaffected by the sale he concluded that all property in a three square mile radius of the site incurred a 32 to 36.54% diminution in value because of its proximity to the site. Diamond stated that the Bartlett property would be worth $118,400 if the site were not there. However, he opined that the property value was worth only $67,500 because of its proximity to the site. He did not conduct a full appraisal of Vincent's property due to its small size. A closer examination of the information used by Diamond in his market analysis reveals that the analysis is flawed by Diamond's exclusion of subdivision sales. While he was correct in stating that subdivision sales were not relevant to the value of the plaintiffs' homes, those sales are relevant to the calculation of the diminution of property values in the area (if any) due to the presence of the site. To calculate the impact of the site on the value of property in the area, all arms length property sales must be considered.
Mr. Darrell Willett testified for the defendants as an expert in the field of real estate appraisals. He did an appraisal of the Bartlett property, comparing it with sales of comparable property within a three-mile radius of the site. As a result, he valued the property at $118,965. He then did an appraisal comparing the property with sales properties not within the area affected by the site. He found that similar properties found outside the site area were not bringing higher sales prices than those located in close proximity to the site. After doing similar evaluations of Vincent's property, he again found no difference in selling prices of similar properties within and without a three-mile radius of the facility. Consequently, the evidence does not support the conclusion that the plaintiffs' property suffered a devaluation because of its proximity to the site.
Since the plaintiffs have not carried their burden of showing damage resulting from the activities at the site, they are not entitled to recover for the negligent conduct, if any, of the defendants.

NUISANCE
Plaintiffs further assert that the jury erred in failing to award damages after finding that the site was in fact a nuisance or an abuse of right. The determination of the existence of a nuisance has recently been explained as follows:
La. C.C. Arts. 667-669 place limitations on the rights of owners by setting out principles of responsibility which require an owner to use his property in such a manner as not to injure another. La. C.C. Art. 667 prohibits uses which cause damage to neighbors or deprive them of the enjoyment of their property, while La. C.C. Art. 668 permits uses which merely cause neighbors some inconvenience. La. C.C. Art. 669 allows suppression of certain inconveniences if excessive under local ordinances or customs, and requires tolerance of lesser inconveniences. Together the three article[s] establish the following principles: No one may use his property so as to cause damage to another or to interfere substantially with the enjoyment of another's property. Landowners must necessarily be exposed to some inconveniences arising from the normal exercise of the right of ownership by a neighbor. Excessive inconveniences caused by the emission of industrial smoke, odors, noise, dust vapors, and the like need not be tolerated in the absence of a conventional servitude; whether an inconvenience is excessive or not is to be determined in the light of local ordinances and customs. Inabnet v. Exxon Corporation, 93-0681 (La.9/6/94), 642 So.2d 1243; Critney v. Goodyear Tire and *1324 Rubber Company, 353 So.2d 341 (La.App. 1st Cir.1977).
We sometimes use the word nuisance in describing the type of conduct which violates the pronouncements embodied in La. C.C. Arts. 667-669. Barras v. Hebert, [602 So.2d 186 (La.App.3d Cir.1992)] supra. While the owners of property are not required to suffer damage as a result of the works undertaken on their neighbor's property, the law has decreed that certain inconveniences must be tolerated. The extent of the inconvenience the property owner must tolerate without redress depends upon the circumstances. When the actions or work cease to be inconveniences and become damaging is a question of fact. King v. Western Club, Inc., 587 So.2d 122 (La.App. 2d Cir.1991); Hobson v. Walker, 41 So.2d 789 (La.App. 2d Cir.1949). The fact finder's decision in a nuisance case cannot be overturned in the absence of manifest error. Barras v. Hebert, supra. The determination is based upon the nature of the intrusion into the neighbor's property, plus the extent or degree of the damage. Hero Lands v. Texaco, Inc., 310 So.2d 93 (La.1975).
In determining whether an activity or work occasions real damage or mere inconvenience, a court is required to determine the reasonableness of the conduct in light of the circumstances. This analysis requires consideration of factors such as the character of the neighborhood, the degree of intrusion and the effect of the activity on the health and safety of the neighbors. Rodrigue v. Copeland, [475 So.2d 1071 (La. 1985)] supra; Day v. Warren, 524 So.2d 1383 (La.App. 1st Cir.1988).
Barrett v. T.L. James & Company, 28170, p. 5-6 (La.App. 2 Cir. 4/3/96), 671 So.2d 1186, 1190-91, writ denied, 96-1124 (La.6/7/96), 674 So.2d 973.
In this case, the jury answered the jury interrogatory concerning nuisance or abuse of right as follows:
3. WAS THE OPERATION OF THE WILLOW SPRINGS WASTE SITE A NUISANCE OR ABUSE OF RIGHT WITHIN THE LEGAL MEANING OF THOSE TERMS AS EXPLAINED IN THE INSTRUCTIONS AND IF SO WAS SUCH NUISANCE OR ABUSE OF RIGHT A LEGAL CAUSE OF ANY DAMAGE TO THE PLAINTIFFS?
 9 3 
 YES NO
Viewed alone, this interrogatory presents a problem. It poses two questions; 1. Was the site a nuisance?; and, 2. Did it cause damage to the plaintiffs? However, it allows for only one answer. Misleading or confusing interrogatories do not adequately set forth the issues to be decided by the jury and may be reversible error where the jury's intent cannot be determined. Diez v. Schwegmann Giant Supermarkets, Inc., 94-1089 (La.App. 1 Cir. 6/23/95), 657 So.2d 1066, writ denied, 95-1883 (La.11/17/95), 663 So.2d 720. When the above jury interrogatory is viewed in isolation, it does appear to be confusing in that it cannot be determined whether the jury was answering one or both questions found therein. However, when the interrogatories are viewed as a whole, the intent of the jury is easily determined. When asked the amount of damage that would compensate each plaintiff for his or her damages the jury entered zero. The answers to the interrogatories make it clear that while the jury felt that the Willow Springs hazardous waste site constituted a nuisance or abuse of right, it did not believe that the site was a legal cause of damage to the plaintiffs. Having so found, the jury's decision is subject to reversal only if manifestly erroneous. Id.
A review of the record reveals that, based on the evidence therein, the jury could reasonably have concluded that while the site did constitute a nuisance, the plaintiffs proved no damage beyond inconvenience. Our review of the jurisprudence reveals no support for the proposition that a finding that the site was a nuisance would relieve the plaintiffs of the need to adequately prove damages. Complaints in connection with the nuisance claim are primarily problems connected with the odors emanating from the site. Evidence was adduced from both defendants' and plaintiffs' witnesses that, at times, the site emitted an odor that could be smelled from several miles away. Mrs. Bartlett *1325 testified that when the smell from the site was bad she had to go inside. She stated that the smell caused her nose and eyes to burn. Gentry Vincent testified that the smell sometimes disturbed his sleep and that, when the smell was bad, he would not turn on his window fans so as not to draw the smell into his house. He stated that the smells caused his eyes to burn and sometimes made him dizzy. Further, the trucks that passed his house would track mud and clay on the road. Mr. Bartlett claimed that once the smell was so bad that it knocked him to his knees. None of the plaintiffs ever consulted a doctor concerning problems allegedly resulting from the smells. None complained of residual effects after the odor problem was relieved. As a result, we cannot conclude that the jury erred manifestly in deciding that the plaintiffs were not entitled to damages for nuisance.

CONCLUSION
For the reasons given herein, the judgment of the trial court is affirmed. Costs of this appeal are assessed the plaintiffs.
AFFIRMED.
AMY, J., dissents and assigns written reasons.
AMY, Judge, dissenting.
In this case, the jury found that the defendants' facility was a nuisance or legal abuse of right and that it was the legal cause of damages. Despite finding that the plaintiffs had been damaged, the jury failed to assign a monetary award for these damages.
Articles 667-669 of the Louisiana Civil Code establish the scope and the limitations on the right of land ownership. Arnold v. Town of Ball, 94-972 (La.App. 3 Cir. 2/1/95); 651 So.2d 313. In order to properly understand these provisions, they must be read together. A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE, PREDIAL SERVITUDES, § 33, at 95. Article 668 requires that a property owner tolerate a mere "inconvenience" caused by his neighbor's actions. Hero Lands Company v. Texaco, Inc., 310 So.2d 93 (La.1975). However, Article 667 provides that a plaintiff may recover after proving that a neighbor's activities are not a mere inconvenience, but cause damages and are a nuisance. Arnold, 651 So.2d 313. Article 667 prevents a property owner from causing "damage to another or ... interfer[ing] substantially with the enjoyment of another's property." YIANNOPOULOS, § 34, at 95. In my view, the record here consistently indicates that this was not a mere "inconvenience," but a nuisance of longstanding which substantially interfered with the plaintiffs' enjoyment of their property. And, in the present case, the jury determined that, indeed, the facility was a nuisance or an abuse of right. Additionally, they found that this nuisance had been the "cause of any damage to the plaintiffs." (Emphasis added). Obviously, both parts of the test for recovery had been satisfied. Despite this clear finding that damage occurred, the jury failed to compensate plaintiffs for the damage inflicted.
The record reflects that the plaintiffs presented a host of evidence sufficient for the jury's finding of damage and assignment of a monetary award. Plaintiffs presented testimony regarding the noxious emissions from the facility, the plaintiffs' exposure to carcinogens from the emissions, and the hazardous nature of the wastes contained at the site. Additionally, the plaintiffs presented testimony regarding the strong odor coming from the facility as early as the 1970s. They produced the facility's own records regarding information about the neighbors' complaints of the odors and the employees' impressions of the odors. Some of the defendants' logs recorded complaints as early as 1980, the same year in which the instant lawsuit was filed.
Plaintiffs further presented evidence as to some of the effects of living next to the facility during its operation. Gentry Vincent testified that not only were the odors terrible, but that his eyes would burn and he would "wake up dizzy every morning." Reverend and Mrs. Bartlett each testified as to the problems they encountered when the odors, which Reverend Bartlett described as "almost unbearable," were present on their property. Mrs. Bartlett reported that she suffered eye and throat irritation from the *1326 odor. Reverend Bartlett stated that, on a day when the odor was particularly strong, he "actually went down to [his] knees" and had to remain indoors for several days until the smell was not as strong. The Bartletts additionally testified, at trial, that they each feared cancer and other health effects from the exposure to the chemicals.
In addition to the evidence of health concerns, the plaintiffs presented expert testimony relating to a devaluation of their properties due to their location next to the defendants' facility. Pat Diamond, plaintiffs' real estate appraiser, testified that property in the immediate vicinity of Gentry Vincent's had suffered a 36.54% reduction in the market value because of the facility and that the Bartlett property had been devalued by approximately 34%. Similarly, Charlie McCain, also a real estate expert, opined that plaintiffs' property had been devalued because of its proximity to the Willow Springs facility.
Therefore, due to the jury's finding of damages and the clear evidence in the record for finding and assessing damages, I conclude that the jury's failure to assign a monetary value for the plaintiffs' damages was not only inconsistent, but, clearly wrong. Appropriate damages should be awarded.
Accordingly, I respectfully dissent.