# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-0875


**BRENT D. GAUTREAU, ET UX**

**VERSUS**

**PAUL M. TRAHAN, ET UX**


************

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT,
PARISH OF ST. LANDRY, NO. 07-C-1478-A
HONORABLE JAMES P. DOHERTY, JR., DISTRICT JUDGE

************

## JIMMIE C. PETERS
## JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and James T. Genovese, Judges.


**AFFIRMED.**

**Peter F. Caviness**
**Dauzat, Falgoust, Caviness and Bienvenu, L.L.P.**
**Post Office Box 1450**
**Opelousas, LA 70571**
**(337) 942-5811**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Brent D. Gautreau**
    **Pamela A. Gautreau**

**Stan Gauthier, II**
**Kristi Hushner Oubre**
**Jonathan D. Mayeux**
**Stan Gauthier, II A Law Corporation**
**1405 West Pinhook Road, Suite 105**
**Lafayette, LA 70503**
**(337) 234-0099**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
  **Paul M. Trahan**
  **Peggy G. Trahan**

PETERS, J.

This appeal arises from the trial court judgment granting a preliminary injunction prohibiting the discharge of firearms from property belonging to the defendants, Paul and Peggy Trahan, in the direction of and across the property of the plaintiffs, Brent and Pamela Gautreau. For the following reasons, we affirm the judgment of the trial court in all respects.

## DISCUSSION OF THE RECORD

The Gautreaus and the Trahans own immovable property adjacent to each other near Sunset, Louisiana, in St. Landry Parish. Both couples maintain residences on their respective properties. The Gautreaus maintain access to their residence by a dirt road located on the boundary line separating the properties. The ownership of the land upon which the dirt road is located is in dispute and was the subject of a March 23, 2007 suit filed by the Gautreaus to fix the boundary between their properties and to enjoin the Trahans from encroaching upon or otherwise using the Gautreau property. The Trahans answered the suit generally denying the allegations.

The Gautreaus amended their original petition on May 3, 2007, or some six weeks after filing the initial suit. In their supplemental and amending petition, the Gautreaus sought injunctive relief to prevent the Trahans, and other persons acting with their consent, from discharging firearms on the Trahan property in such a manner that the projectiles or rounds fired from the firearms might enter upon or cross the Gautreau property. The Gautreaus sought this relief based on the assertion that the Trahans, and others acting with their consent or participation, had begun discharging firearms on their property in the direction of the Gautreau property since the filing of the March 23, 2007 suit. In response to the amending petition, the trial court issued a temporary restraining order and set a hearing date for the requested

preliminary injunction. In their answer to the amending petition, the Trahans admitted that Paul Trahan had discharged firearms in the direction of the Gautreau property, but denied all other allegations.

At the May 11, 2007 preliminary injunction hearing, the evidence established without dispute that Paul Trahan had constructed a homemade backstop for target practice purposes approximately 380 feet south of a coulee which divides the two properties at issue, and that the Gautreau home and yard are located immediately north of the coulee, although not directly in line with the backstop. However, the Gautreaus often use the property directly in line with the backstop. Mr. Trahan initially constructed the backstop using railroad cross ties, and it originally measured five feet wide and six feet high. After the Gautreaus first complained, Officer Joseph Mamou of the St. Landry Parish Sheriff's Office came to the Trahan house, observed the backstop, and recommended that Mr. Trahan increase the size of the backstop. Based on this recommendation, Mr. Trahan increased the width to fifteen feet and the height to eight feet. The photograph of the backstop introduced into evidence by the Trahans reflects a crudely built, straight wall consisting of an assortment of cross ties, boards, logs, and metal sheets.

Paul Trahan acknowledged in his testimony that he used the backstop for target practice purposes at least three times per week for thirty-minute periods and that, on occasion, he allowed his son and brother-in-law to fire weapons toward the backstop. Those using the shooting range would fire at paper targets mounted on the backstop from a range of approximately thirty feet. Additionally, Mr. Trahan admitted using several different weapons, including a .45 caliber pistol firing hollow point bullets, a .357 magnum pistol, a .22 caliber pistol, and a .380 pistol. According to Mr.

2

Trahan, the .45 caliber weapon had a penetration depth of three inches into the backstop, and the .357 magnum weapon had a four-inch penetration depth. He acknowledged that absent the protection of the backstop, both weapons had a range far in excess of the 380 feet to his property line.[1] However, he asserted that the activity presented no danger because he never missed the backstop. Furthermore, he denied ever shooting in any direction except toward the backstop.

With regard to the safety issue as well as the timing and direction of fire, the Gautreaus presented evidence contrary to Mr. Trahan's testimony. Brent Gautreau testified that the firing did not begin until he filed the boundary suit, and that the timing of the firing always coincided with times when he and his family or guests were using the property immediately behind the backstop. That is to say, when individuals were physically in the danger zone. Pamela Gautreau testified to observing an individual near the coulee shooting in the direction of her home and that on occasion she would hear shooting that obviously did not hit the backstop because there was no "reverb." Camille Gautreau, the plaintiffs' fourteen-year-old daughter, testified that one day, as she rode her horse along the dirt road on the property line, Mr. Trahan fired a gun across the road ahead of her, and that approximately three weeks before the hearing on the preliminary injunction, a similar incident happened when she rode her four-wheeler on the dirt road. Eddie Gautreau, Brent Gautreau's father, testified that he had been on the property on numerous occasions when shots were fired, and that the only defense the family had was to retreat inside the house. Officer Christopher Malang of the Cankton Police Department testified that on the occasion when he was called to investigate the Gautreaus' complaint, he heard five

---

[1]Mr. Trahan testified that the .45 caliber weapon had an effective range of 600 feet.

shots ring out from the direction of the Trahan property as the Gautreaus' daughter walked into what appeared to be the line of fire, and he ordered everyone back into the house. When he went to the Trahan home to investigate, Mr. Trahan told him that he had been firing toward the backstop, but the officer concluded that the shots he heard did not originate from behind the backstop; that they originated from no more than one hundred yards away as he stood in a clearing near the Gautreau home.

After completion of the evidence, the trial court issued a preliminary injunction enjoining and prohibiting the Trahans and anyone acting in concert with them or participating with them from discharging firearms and other weapons in the direction of or across the property of the Gautreaus. The trial court signed a judgment to this effect on June 14, 2007, and the Trahans have appealed.

**OPINION**

"An appeal may be taken as a matter of right from an order or judgment relating to a preliminary or final injunction." La.Code Civ.P. art. 3612(B). A trial court's determination as to whether to issue a preliminary injunction is subject to the abuse of discretion standard of review. *Smith v. W. Va. Oil & Gas, Co.*, 373 So.2d 488 (La.1979).

The judgment signed by the trial court on June 14, 2007 restrains, enjoins, and prohibits the Trahans, and all those acting on their behalf or in concert with them, "from discharging firearms and other weapons in the direction of and/or across the property of the [Gautreaus], at all times, including, particularly, but not limited to, those times the [Gautreaus], their minor children and anyone else on their property with their consent and permission are making use of the [Gautreaus'] property." On appeal, the Trahans assert that the trial court abused its discretion in prohibiting them

4

from discharging firearms or other weapons *in the direction* of the Gautreau property without a sufficient showing of irreparable injury to the Gautreaus.

In its oral reasons for judgment, the trial court expressed its belief in the testimony of Camille Gautreau with regard to the shooting incidents across her path of travel on the dirt road. That being the case, the trial court expressed no difficulty in enjoining the firing of weapons "onto or across the property." However, the trial court expressed its concern that an injunction prohibiting the Trahans from firing "in the direction" of the Gautreau property, absent a showing that the shots actually traveled across the property, would unreasonably restrict the Trahans' enjoyment of their property. Nevertheless, the trial court granted the injunction prohibiting such activity as well. In reaching that decision, the trial court balanced the competing interests at issue in favor of the Gautreaus. The trial court recognized that the Trahans have the right to use their property in any manner that "doesn't interfere with someone else's enjoyment of their property or place them in danger" and concluded that the issue in this matter was whether Mr. Trahan should be prohibited from firing in the direction of the Gautreau property, even while using the backstop. The trial court then concluded that the safety of the Gautreaus and their family superceded the right of the Trahans to use their property in a manner of their choosing and granted the preliminary injunction.

We agree with the trial court's conclusion that the ultimate issue is the safety of the use of the backstop. At the hearing, both the parties and the trial court approached this preliminary injunction matter within the context of the Louisiana Civil Code articles on vicinage, specifically, La.Civ.Code arts. 667-669.[2] These

---

[2]"Louisiana Civil Code Article 667 provides, in pertinent part, that "[a]lthough a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive

5

articles principally govern the rights and obligations of neighboring proprietors. *Inabnet v. Exxon Corp.,* 93-681 (La. 9/6/94), 642 So.2d 1243. Specifically, they place limitations on the rights of owners by setting out principles of responsibility applying the doctrine of *sic utere tuum ut alienum non laedas*, which requires an owner to use his property in such a manner as not to injure another. 4 A.N. Yiannopoulos, **Louisiana Civil Law Treatise-Predial Servitudes** §§ 25, 33 (1983). The obligations contained in these articles are legal servitudes imposed on the owner of property and "embody a balancing of rights and obligations associated with the ownership of immovables." *Rodrigue v. Copeland*, 475 So.2d 1071, 1077 (La.1985), *cert. denied*, 475 U.S. 1046, 106 S.Ct. 1262 (1986). The general rule is that a landowner is free to exercise his rights of ownership in any manner that he sees fit. He may even use his property in ways which cause some inconvenience to his neighbor. However, a landowner's rights do not allow him to do real damage to his neighbor. *Id.*

---

his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him." Additionally, La.Civ.Code art. 668 provides:

> Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.

> Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's [neighbor's] house, because this act occasions only an inconvenience, but not a real damage.

Finally, La.Civ.Code art. 669 provides that:

> If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.

We agree that the rules of vicinage apply to the matter now before us. The Trahans assert that maintaining a private shooting range on their property is a free exercise of their rights of ownership that should not be enjoined even though, by using the backdrop at issue, the weapon would be fired in the direction of the Gautreau property. In support of this argument, they point to Mr. Trahan's testimony that he has never fired a weapon on his property except on his shooting range in the direction of the backstop, and that he has never missed the backstop. They further insist that the backstop as enlarged, together with Mr. Trahan's shooting skill, provides protection to their neighbors. The Gautreaus, on the other hand, point to the evidence presented that, from sound alone, it has been determined that some bullets fired on the Trahan property did not impact the backstop. The trial court accepted the testimony presented by the Gautreaus that bullets fired from the Trahan property entered the Gautreau property.

As previously stated, the Trahans' assignment of error complains only of that portion of the preliminary injunction that prohibits them from firing *in the direction* of the Gautreau property, an injunction which they translate into a prohibition against using their shooting range. However, if we accept Mr. Trahan's testimony that he never fires a gun on his property except at targets mounted on the backstop of his shooting range, and consider the evidence believed credible by the trial court that bullets on many occasions crossed the property of the Gautreaus, then it follows that bullets fired from the Trahan property at targets mounted on the backstop escaped their property.

Officer Malang testified that he found 12-gauge shotgun, rifle, and handgun casings on the ground near the backstop. Mr. Trahan said the bullets from his .45

7

caliber pistol had a penetration depth into the backstop of three inches, and the .357 magnum a penetration depth of four inches. He testified that at least one of his weapons, the .45 caliber handgun, had a range well beyond his own property line when fired in the direction of the Gautreau residence. He explained that the reason he chose to orient his shooting range as he did is that if he shot in any other direction other homes in the neighborhood would be closer than that of the Gautreaus.

It is clear from this testimony that the only protections the Gautreaus have from a stray bullet from the shooting range are Mr. Trahan's accuracy as a shooter and the reliability of the backstop to contain, and not deflect, every bullet fired on the range. It was not an abuse of the trial court's discretion to conclude that neither of those safeguards enjoyed a measure of reliability sufficient to condone the continued operation of the Trahans' shooting range in the name of the free exercise of their property rights, when the facts support the trial judge's finding that the shooting range has a history of escaping projectiles.

No expert testimony was produced regarding the safety design of this shooting range, but none was needed under these factual circumstances to establish the grave danger to the Gautreaus and their property. Common sense does that. Mr. Trahan's shooting skill, however good, is not perfect. A shooting range backstop that will not prevent the endangerment by stray bullets of residences and people in the line of fire and within the range of the weaponry used is not adequate. While no evidence was introduced regarding the specifications of a shooting range in this locale that might have sufficed, this one unquestionably fell woefully short.[3] The gravity of the risk

_____

[3]Deputy Mamou never claimed to be an expert on shooting ranges. When he first saw the backstop he suggested only that Mr. Trahan make it "two, three feet taller" and "[m]aybe fifteen, twenty feet wider," so it would be a "more safer [sic] environment."

it presented cannot be seriously questioned. Simply stated, marksmen miss targets from time to time, and even those projectiles that hit a target may be prone to ricochet in unprotected directions.

When the Trahans chose to use their property as a firing range and constructed thereon a backstop for that purpose, it became their obligation to ensure that the backstop would serve its purpose. They cannot rationalize doing with their estate whatever they pleases if they rely solely upon Mr. Trahan's claimed inerrancy as a marksman and a home-made backstop having obviously inadequate containment features.

Our supreme court has held that the action for an injunction under La. Civ.Code arts. 667-669 is controlled by La.Code Civ.P. art. 3601. *Rodrigue,* 475 So.2d 1071. Since the Gautreaus seek injunctive relief, they must prove irreparable injury in addition to the necessary showing of real damage under Articles 667-669. Louisiana Code of Civil Procedure Article 3601 provides in pertinent part that "[a]n injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law." "The jurisprudence interpreting La.Code Civ.P. art. 3601 holds that, while the trial court has broad discretion in deciding whether to grant injunctive relief, injunction is an extraordinary remedy and should only issue where the party seeking it is threatened with irreparable loss without adequate remedy at law . . . ." *Jim Walter Homes, Inc. v. Jessen*, 98-1685, p. 6 (La.App. 3 Cir. 3/31/99), 732 So.2d 699, 703.

The trial court did not abuse its discretion in concluding that the Gautreaus made a showing that they could be irreparably harmed unless injunctive relief was granted. Irreparable injury has been defined as "a loss sustained by an injured party

9

which cannot be adequately compensated in money damages or for which such damages cannot be measured by a pecuniary standard." *Terrebonne Parish Police Jury v. Matherne*, 405 So.2d 314, 319 (La.1981), *cert denied*, 456 U.S. 972, 102 S.Ct. 2234 (1982). In *Dejean v. Fritz Field Hunting Club,* 602 So.2d 168 (La.App. 3 Cir. 1992), we upheld a preliminary injunction prohibiting the lessor of a right-of-way from shooting deer on the right-of-way over which the plaintiff enjoyed a predial servitude. We found that injunctive relief was necessary to eliminate interference with plaintiff's use of the servitude, reasoning that if the owner of the servient estate could not make the use of the servitude more inconvenient, he certainly could not make its use more dangerous. Although that case was decided on predial servitude obligations imposed by La.Civ. Code arts. 651 and 748, and not the predial obligations imposed by the vicinage articles, the analogy is apparent and needs no elaboration from us.

The issuance of a preliminary injunction will not be disturbed on appeal absent an abuse of discretion. *Smith*, 373 So.2d 488. The issuance of a preliminary injunction in this case was not an abuse of the trial court's discretion.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment granting the preliminary injunction in favor of Brent and Pamela Gautreau. We assess all costs of this appeal to Paul and Peggy Trahan.

**AFFIRMED.**