GARRETT, J.
_JjThe defendant, USA Speedway, LLC (“USA”), appeals from a trial court judgment granting a permanent injunction which prohibits it from operating a commercial automobile racetrack on its property in Union Parish. For the following reasons, we affirm.
FACTS
USA is an automobile racetrack located in rural Union Parish and operated by Bobby “Jerry” Hobson. The commercial competitive car racetrack was built by USA in 2009. Racing began in the spring of 2010. On August 5, 2010, neighbors living in the rural community filed suit against Hobson Wrecking, another company operated by Hobson, and USA seeking damages and a permanent injunction. Eighteen plaintiffs were named in the original suit, claiming that the noise and dust from racing were beyond what would aggravate a person of ordinary sensibilities. Eventually, the plaintiff list was expanded to 59 persons.[1]
The plaintiffs urged that the racetrack operated on weekends from 7:00 p.m. until 1:00 or 2:00 a.m., with practice races throughout the week. 12They claimed that the noise prevented them from enjoying their homes, the dust aggravated respiratory problems, and their property values weré reduced. According to the plaintiffs, the defendants’ activities violated La. C.C. arts. 667-669 on the obligations of vicinage and created an ongoing nuisance.
The defendants sought a trial by jury on the issue of damages. Eventually, the is *1120 sues of entitlement to a permanent injunction and damages were bifurcated. The bench trial on the permanent injunction was held on November 5 and November 27, 2012.
TRIAL TESTIMONY
Because this matter is fact intensive and the trial court made credibility determinations due to the differing viewpoints presented, a synopsis of the evidence and testimony adduced at the trial is necessary.
E.J. Simmons, one of the plaintiffs, testified that he lives 3/8 of a mile from the racetrack. His property is on the west side of the track. In 2006, Simmons moved to the area from California because it was quiet. However, USA now has weekly races from March to September and sometimes the races go into October and November. Cars run on the track at other times during the week. In the beginning, the races were held on Friday nights. Now the races are held on Saturday nights. According to Simmons, the cars start tuning up at 3:00 p.m. on race days. The races begin at 6:00 or 7:00 p.m. and go until 1:30 or 2:00 a.m.
Simmons obtained a sound level machine and made a contemporaneous log of the sound levels at various times in the neighborhood, both before and after the suit was filed. On June 4, 2010, ^during a racing event, the sound level at various locations near the track ranged from 80 to 96 decibels. Simmons measured sound levels again on March 16, 2012; they ranged from 59 to 86 decibels. On March 23, 2012, sound levels ranged from 51 to 89 decibels. Sound readings on July 14, 2012, ranged from 54 to 87 decibels. On August 4, 2012, sound levels ranged from 65 to 80 decibels. On August 11, 2012, the sound levels ranged from 70 to 88 decibels.
Simmons testified that he appeared in a video recording made in 2010 which demonstrated the noise level at the racetrack when the cars were racing. He described the noise as agitating and, at midweek, he begins dreading the approaching weekend and prays for rain. He stated that on race nights he has to listen to the noise sometimes until 3:00 a.m. He is 60 years old arid does not stay up past 9:00 p.m. He is tired and “pretty much shot” the day after races are held and cannot get motivated to do anything. He had a regular fishing trip on the weekend which ceased to be enjoyable because the sound of the racing kept him awake until 3:00 a.m. Simmons stated he frequently called the local sheriffs office to complain about the noise and was told to “deal with it.”
On cross-examination, Simmons was questioned about the sound recording device he used to record sound levels coming from the racetrack. He stated that it was a Radio Shack sound meter and he had no information as to whether the device had been calibrated. He did not place the device on a tripod to obtain readings as recommended by the user manual. At one point, Simmons said, “We know that it’s probably a 29-dollar piece of Chinese crap that I used to get baseline readings.” He explained that he was |4trying to get a baseline of the sound levels when there is no racing as opposed to when there is racing. He said, “I was trying to work off a baseline ambient noise up to loud, louder, and too damn loud.” Simmons has medicine for a back condition which he takes on race nights because it helps him to sleep.
Patricia Moss, another plaintiff, testified that she has lived in her home near the racetrack for more than 25 years. Her home is located on the east side of the track. It had been a quiet, peaceful neighborhood. She stated that the races occur from February through October and end around 1:30 a.m. Practice runs are held at other times. She stated that the sound *1121 from the racetrack is loud, noisy, and mind-boggling. On weekends, she stays away from home to some extent. Moss stated that the races disrupt her sleep and she stays up until the early morning hours on her computer because of the noise. She stated she had not sought medical treatment because of her complaints with the racetrack. Moss testified that the sound on the video recording accurately depicted the noise from the racetrack that she hears in her house.
Greg Horne, another plaintiff, lives in Monroe. In 2004 or 2005, he and his wife purchased property in Union Parish on the river in anticipation of building a house in what was intended to be a gated community. Their property is on the east side of the track. Horne had used the property for recreational purposes, but since the racetrack has been in operation, he uses the property very little. He has no intention of building a house on the property as long as the racetrack remains in business. Horne said he cannot carry on a conversation or make a phone call on the property during the graces. He stated that another video admitted into evidence on behalf of the plaintiffs was taken on his property during a race event. He and his wife appear in this video. According to Horne, the noise on the video was from only one car; the sound is much louder when several cars are racing. He said that the noise was louder than that depicted on the recording and had more impact in real life. Although the video was made in 2010, and changes had been made to the racetrack since that time, Horne testified that the sound has not diminished.
Horne has asthma, chronic obstructive pulmonary disorder (“COPD”), and lung cancer that is in remission and is bothered by the dust generated by the racetrack. Horne said that the presence of the racetrack has caused him a lot of stress due to the time and money he spent on his property. He had anxiety about whether he had lost money on his investment. He stated that his property is 800 yards from the racetrack and there previously had been a number of trees, but the trees have been thinned and now the race cars are visible.
Adrienne Gowan, another plaintiff, testified that she has lived on her property for approximately 28 years and the area was quiet before the racetrack opened. She testified that she lives close to the racetrack. Her property is on the northwest side of the track. Gowan has an 11-year-old son and a 15-month-old daughter. She said that her children cannot sleep on race nights and her daughter is agitated by the noise and vibrations. She stated that the noise is mind-numbing and she cannot use her computer, hear the television, concentrate, or listen to music during the races. Gowan |,¡claimed that the racing activities generated a lot of dust, which aggravated her sinuses and allergies.
Hobson was called to testify on cross-examination by the plaintiffs and then later testified on behalf of USA when it presented its case. He is the manager and one of the two members of the LLC. He lives in the neighborhood and opened the racetrack in 2010. He stated that the races begin in March and continue through Labor Day. There were eight make-up races caused by rain-outs and one “play-day” was held in February for cars to use the racetrack. Hobson stated that a country music concert had recently been held on the property and more than 1,000 people attended.
According to Hobson, between 40 and 50 cars participate in the races. Before the races, music is played on the loudspeakers. In 2010, between 300 and 500 people came to the races. Attendance is now between 150 and 300 people. Hobson testified that the track is wet down to alleviate the dust. *1122 He said that cars arrive around 5:00 p.m. and racing begins at 7:30 p.m. The goal is to end racing by 11:00 p.m. Five classes of cars race at the track. Several heats are held for each class to determine participation in the featured races. After the heats, five featured races are held, one for each class. Feature races have a 30-min-ute time limit. Cautions occur frequently which extend the time of the races. There are 10-minute intermissions between the races.
Hobson said that the second year the track was in operation he took steps to muffle the sound. He lowered the track and built berms around it, and planted pampas grass on top of the berms. He built a sound wall, put up |7barriers, and required the cars to have mufflers. Hob-son said that he planted 650 trees and now has three trucks to water down the track.
Vern Breland, the mayor of Sterlington, testified on behalf of USA. He lives close to the racetrack and can hear it from his home. He stated that the town is one of the sponsors of the racetrack and it has a direct economic impact on the area.
Joseph Michael Jones, an agent with the Louisiana Department of Wildlife and Fisheries, testified on behalf of USA. He lives one-half mile from the racetrack and has not experienced any problems with noise or dust. Jones is paid for working at the racetrack and was formerly married to Hobson’s daughter.
Angela Hadley testified on behalf of USA. She lives 20 yards from the racetrack with her children who are four, six, and eight years old. She denied experiencing any problems with noise or dust. Hobson pays Hadley to clean up at the racetrack after the races.
James Lee Johnson testified on behalf of USA. He lives closer to the racetrack than Simmons, one of the plaintiffs. Johnson denied any negative impact from the noise and dust. However, he acknowledged that he has to turn his television louder to hear it.
Sandra Nixon testified on behalf of USA. She lives near the racetrack and denied any problems with noise or dust. She enjoys attending the races and is a good friend of Hobson’s wife.
Prentiss Wade testified on behalf of USA. Although he does not live near the racetrack, he attends the races regularly and is an avid race fan. [ RWade has COPD and stated that the track was not dusty enough to bother him.
Thomas E. Forbes testified on behalf of USA. He lives one-quarter of a mile from the racetrack and stated that it has not created any problems for him. He is a friend of the Hobsons.
James Furlow testified on behalf of USA. He lives less then two miles from the racetrack and testified that the fishing on the river is better when the cars are racing.
Marvin Simpson, who testified on behalf of USA, operates a convenience store near the racetrack. He testified that the races have improved his business.
John Stephen Yerret was retained by USA as an expert in industrial hygiene. His business involves measuring community noise or sound levels. From March through September 2012, on five occasions, he monitored the sound levels from the public roadway in front of some of the plaintiffs’ property, including Gowan, Simmons, Horne, and Moss. He set up a sound level meter which was calibrated before and after use. During his monitoring sessions, he remained at each location for 10 minutes and monitored two or three races during that time period. His monitoring periods ended by 8:30 or 9:30 p.m. each night. He took the data and averaged the sound levels for each location and then averaged the averages. Using this meth *1123 od, Verret concluded that the average sound level, known as the Leq, was 64-68 decibels. He opined that, at this sound level, the noise from the racetrack is noticeable, but has no significant impact on the community.
|flThe report prepared by Verret showed that the average decibel readings at the Gowan residence were 60 on June 1, 69.2 on July 14, with a maximum reading of 78.2 on June 1. The average decibel readings at the Simmons residence were 64.8 on March 16, 71 on June 22, with a maximum of 84.5 on August 11. The average readings at the Moss residence were 56 on June 1, 73.5 on June 22, with a maximum of 79.8 on July 14. The averages at the Horne property were 56 on June 1, 73.5 on June 22, with a maximum of 77.2 on June 12.
Verret also measured sound level of the plaintiffs’ video recordings played in the courtroom. Those sound levels were 77-78 decibels. However, Verret opined that those readings could be affected by the equipment used to make the recording, as well as by the equipment used to play the recording in court.
Plaintiffs’ counsel cross-examined Verret extensively about his opinion and the case of Parish of East Feliciana ex rel. East Feliciana Parish Police Jury v. Guidry, 2004-1197 (La.App. 1st Cir.8/10/05), 923 So.2d 45, writ denied, 2005-2288 (La.3/10/06), 925 So.2d 515, in which he was an expert witness for the parties seeking an injunction. In Guidry, the defendant constructed a commercial motorcycle racetrack. Neighbors complained about the noise and dust. The parish filed a petition for an injunction to prohibit the operation of the racetrack, claiming that the defendant’s activities violated parish ordinances for both nuisance and noise. Some of the neighbors intervened, claiming the defendant’s activities violated La. C.C. art. 667-669. Verret made sound recordings on the property of two of the interveners. At one location, the average readings 11flranged from 45-58 decibels. Maximum readings ranged from 54-69 decibels. At the other location, average readings ranged from 55-66 decibels, with maximum levels ranging from 68-85 decibels.
In Guidry, Verret referred to recommendations by the Environmental Protection Agency (“EPA”) which stated that decibel readings in-the 50s cause a slight disturbance of normal voice or relaxed conversation. At' 60 decibels, there is a moderate disturbance of normal voice or relaxed conversation. At 65 decibels, there is a significant disturbance of normal voice or relaxed outdoor' conversation at one-tenth of a meter distance. At 70 decibels, there is a significant disturbance of normal outdoor speech. About 25% of the population would be highly annoyed and community reaction would be severe. At 75 decibels, hearing loss might occur in sensitive individuals. In Guidry, Verret testified that the noise level readings he measured would constitute an aggravation or nuisance to persons of ordinary sensibilities.
The plaintiffs’ counsel pointed out that the average and maximum sound levels in this case were higher than those in Gui-dry, which Verret found to be unacceptable. Verret replied that he used different techniques and instrumentation in the two cases and was reluctant to draw comparisons. He stated that the sound from the motorcycles in Guidry was high frequency noise that was not constant and the occurrence of which is hard to predict. Verret stated that this type of sound is more unpleasant than the constant sound of race cars in the present case. Verret also testified that the maximum sound readings in this case were compromised by barking dogs, string trimmers, motorcycles driving by, and his own two-way radio.
*1124 JjjTRIAL COURT ACTION
The record reflects that the trial court paid close attention to the testimony and posed many questions to witnesses to clarify matters. It issued lengthy written reasons for judgment on February 14, 2013. The trial court found that La. C.C. arts. 667-669 applied to this matter. It stated that the test of entitlement to a permanent injunction against the maintenance of a nuisance is whether the alleged nuisance produces serious or material discomfort to persons of ordinary sensibilities in a normal state of health. In order to obtain injunctive relief, a party must show irreparable injury and real damage. The issuance of an injunction takes place only after a trial on the merits and the plaintiffs have to prove their case by a preponderance of the evidence.[2]
According to the trial court, the racing season is March-October with a “playday” in February. On race days, cars begin tuning up around 3:00 p.m. Forty to 50 racers participate and country music is played on the loudspeakers 30 minutes before the races begin. The noise can be heard up to a mile and a half away.
The trial court found that those living within 600 feet of the racetrack experience noise that is very loud and “mind boggling,” causing agitation, anger, disturbance of sleep and dread of the coming race weekends. One plaintiff testified that he took sleeping medication and presented a video recording depicting the noise levels during racing. Another plaintiff testified [ 12that he cannot carry on a conversation on his property during racing and has experienced significant anxiety. Still another plaintiff stated that her family has experienced sleep disturbances and agitation and the dust has aggravated sinus problems.
The trial court noted that the defendants called several witnesses who lived or worked in the area and testified that the noise was not a nuisance. However, it observed that all but one of these witnesses derived financial benefit from the racetrack or frequently attended the races.
The court considered Verret’s testimony as an expert in the field of industrial hygiene and his opinion that the noise levels during the races in 2012 were not significant. The trial court stated that Verret’s method was not helpful because his readings included periods when no racing was in progress. The court found that the information would have been more meaningful if Verret had recorded the average sound level while the cars were racing.
The court noted that Verret measured the decibel level on the plaintiffs’ audio-video recording played in court at 77-84 decibels, measurements that corroborated the plaintiffs’ version of the sound levels during racing. According to Verret’s testimony, sound levels above 75 are severe.
The trial court found the plaintiffs’ testimony to be credible; the plaintiffs’ audio-video recordings accurately reflected the sound levels in the area during racing; and those levels were excessive, intrusive, unreasonable and incompatible with persons using and enjoying their private residences during racing events. The trial court stated that the levels are intolerable to |1spersons of normal sensibility; sound levels actually produced are much higher than the average measured by Verret and are such as to cause a significant disturbance in the community.
*1125 While the trial court sympathized with USA, and recognized the loss of economic benefit to the area, it found that the plaintiffs were entitled to a permanent injunction and damages if proven.
On February 28, 2013, the trial court filed a judgment permanently enjoining USA from operating a commercial racetrack at its location in Union Parish and finding it to be liable for damages if any are proven at a later time. The judgment was designated as a final appealable judgment.
On appeal, USA contends that the trial court was manifestly erroneous in finding that “real damage” was shown by the plaintiffs sufficient to justify the issuance of a permanent injunction, that the trial court erred as a matter of law by failing to recognize that the plaintiffs were required to provide strict proof of an excessive and unreasonable nuisance that caused real damage and irreparable harm, and that the trial court erred as a matter of law in issuing a broad, all-encompassing injunction that shut down USA instead of crafting an injunction to the specific circumstances of the case.
PROOF OF REAL DAMAGE
USA contends that the trial court erred in finding that real damage was shown by the plaintiffs sufficient to justify the issuance of a permanent injunction. This argument is without merit.
Legal Principles
La. C.C. art. 667 provides:
| HAlthough a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case. Nonetheless, the proprietor is answerable for damages without regard to his knowledge or his exercise of reasonable care, if the damage is caused by an ultrahazardous activity. An ultra-hazardous activity as used in this Article is strictly limited to pile driving or blasting with explosives.
La. C.C. art. 668 states:
Although one be not at liberty to make any work by which his neighbor’s buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors’s [neighbor’s] house, because this act occasions only an inconvenience, but not a real damage.
La. C.C. art. 669 provides:
If the works or materials for any manu-factory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.
The obligations of vicinage contained in these articles are legal servitudes imposed on the owner of property. These *1126 provisions embody a balancing of rights and obligations associated with the ownership of immovables. As a general rule, the landowner is free to exercise his rights of | lsownership in any manner he sees fit. He may even use his property in ways which occasion some inconvenience to his neighbors. However, his extensive rights do not allow him to do “real damage” to his neighbor. Rodrigue v. Copeland, 475 So.2d 1071 (La.1985), cert. denied, 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986); Barrett v. T.L. James & Co., 28,170 (La.App.2d Cir.4/3/96), 671 So.2d 1186, writ denied, 96-1124 (La.6/7/96), 674 So.2d 973.
La. C.C. arts. 667-669 place limitations on the rights of owners by setting out principles of responsibility which require an owner to use his property in such a manner as not to injure another. La. C.C. art. 667 prohibits uses which cause damage to neighbors or deprive them of the enjoyment of their property, while La. C.C. art. 668 permits uses which merely cause neighbors some inconvenience. La. C.C. art. 669 allows suppression of certain inconveniences if excessive under local ordinances or customs, and requires tolerance of lesser inconveniences. Together the three articles establish the following principles: No one may use his property so as to cause damage to another or to interfere substantially with the enjoyment of another’s property. Landowners must necessarily be exposed to some inconveniences arising from the normal exercise of the right of ownership by a neighbor. Excessive inconveniences caused by the emission of industrial smoke, odors, noise, dust vapors, and the like need not be tolerated in the absence of a conventional servitude; whether an inconvenience is excessive or not is to be determined in the light of local ordinances and customs. Inabnet v. Exxon Corp., 93-0681 (La.9/6/94), 642 So.2d 1243; Barrett v. T.L. James & Co., supra; Critney v. Goodyear Tire & Rubber Co., 353 So.2d 341 (La.App. 1st Cir.1977).
We sometimes use the word nuisance in describing the type of conduct which violates the pronouncements embodied in La. C.C. arts. 667-669. Barrett v. T.L. James & Co., supra. While noise and dust do not necessarily constitute a nuisance, in some instances they may be so, depending upon the particular circumstances. Barrett v. T.L. James & Co., supra. The test of the right to an injunction against the maintenance of a nuisance is whether the alleged nuisance produces serious or material discomfort to persons of ordinary sensibilities in a normal state of health. Rodrigue v. Copeland, supra; Parish of East Feliciana ex rel. East Feliciana Parish Police Jury v. Guidry, supra. Although the common law of nuisance has no binding, prece-dential value in the courts of this state, that body of law does correspond to some extent with the obligations of neighborhood established by La. C.C. arts. 667-669. Rodrigue v. Copeland, supra.
In determining whether an activity or work occasions real damage or mere inconvenience, a court is required to determine the reasonableness of the conduct in light of the circumstances. This analysis requires consideration of factors such as the character of the neighborhood, the degree of intrusion and the effect of the activity on the health and safety of the neighbors. Rodrigue v. Copeland, supra; Barrett v. T.L. James & Co., supra. When the actions or work cease to be inconveniences and become damaging is a question of fact. Barrett v. T.L. James & Co., supra. The fact finder’s decision in a nuisance case cannot be overturned in the absence of manifest error. Barrett v. T.L. James & Co., supra.
Discussion
In support of its argument, USA contends that all evidence concerning the level *1127 of noise presented by the plaintiffs was based upon occurrences in 2010 and 2011, before sound abatement measures were undertaken at the racetrack. This argument is not supported by the record. The exhibits introduced into evidence show that some of the contemporaneous sound level records were made by Simmons in 2012, on various dates and at different locations near the racetrack. These readings ranged from 51 to 89 decibels. Although USA strenuously attacked the methods Simmons used in testing the sound levels, the trial court found the records to be admissible and we detect no error in that ruling.
USA also argues that the plaintiffs’ video recordings of the noise level from the racing should not have been considered by the trial court. USA did not assign as error the admission of video recordings of the sound levels created by the racetrack. However, in its brief on appeal, it reasserts its claims that the videos were inadmissible hearsay and were admitted without a proper foundation. USA specifically objects to comments made by individuals in the videos. As found by the trial court, the videos were not admitted for the truth of the content of the discussions therein and the discussions were not considered by the court. Rather, the videos reflected the level of sound during the races. The trial court did not err in admitting the videos for that limited purpose. After listening to the sounds of the [^racetrack on the videos, we further observe that the trial court was reasonable in concluding that the sound was severe.
USA also argues that the duration of the races was limited to only 22.5 hours per year. These calculations did not consider the testimony in the record that the race track is used at other times during the week and throughout the year when official races are not being conducted.
USA next contends that the trial court reached incorrect conclusions about the testimony of its sound expert, Verret, and incorrectly assumed that sound levels were recorded when there was no racing. This argument is not supported by the record.
The trial court has great discretion to accept or reject expert testimony. Harp v. Autrey, 47,749 (La.App.2d Cir.8/21/13), 121 So.3d 1260, writ denied, 2013-2263 (La.12/2/13), 126 So.3d 1286. At the hearing, the trial court posed many questions to Verret in an effort to get to the “meat of the coconut.” The trial court questioned Verret about his measurements and asked whether the average of 64-68 decibels was measured while the automobiles were racing. Verret responded, “Correct.” The court then inquired as to what a monitoring period included, asking whether it commenced when a race started and ended when a race ended, or whether it included periods when there were no races going on. Verret explained that in each instance, he monitored multiple races over a 10-minute period. The court asked whether there were times during the monitoring when a race was not being conducted. Verret said that could be measured in seconds because there was little lag time between the races. The court again asked, “And sometimes during the monitoring period, there was no racing going?” Verret 119responded, ‘Tes. That could have been, right.” This exchange demonstrates that Verret’s sound readings included some periods where no racing was going on.
The trial court did not err in its conclusions regarding Verret’s testimony. We note that Verret’s sound level records were brought into question by the facts of this case. Verret measured sound levels for 10-minute intervals and stopped measuring sound levels at 8:30 or 9:30 p.m., which is fairly early in the evening. His testimony about the duration of the races differs from Hobson’s testimony about how the races are conducted and how long they *1128 last. According to Verret, the races lasted for short periods of time with only seconds between races. He claimed to have monitored several races over a 10-minute period. Hobson stated that heats are held to determine which cars will race in the feature races. Feature races have a 30-min-ute time limit. Sometimes there are cautions where the cars slow down on the track. This prolongs the duration of the race. There are also 10-minute intermissions between some races.
The maximum sound levels observed by Verret ranged from 77.2 to 84.5 decibels. However, he sought to discount the high decibel levels by attributing them to motorcycles driving by, string trimmers operating nearby, and by his own two-way radio. In the Guidry case, Verret testified that average levels of 45 to 58 and 55 to 66 decibels, with máximums of 54 to 69 and 68 to 85 decibels, would constitute an aggravation and nuisance to persons of ordinary sensibilities. In Guidry, Verret concluded that the noise levels he observed can affect blood pressure and cause nervous conditions and stress. In the present case, the observed decibel levels in 2012, after 12nnoise abatement measures had been taken, were higher than those in Guidry. Verret testified in this case that levels of 64 to 68 decibels, which were an average of the averages, would have no significant effect on the community. However, according to the EPA standards he cited in Guidry, noise may be considered to be an adverse aspect of the community environment at the 60-decibel level. At 65 decibels, there could be a significant disturbance of normal voice or relaxed outdoor conversation at one-tenth of a meter distance and at 70 decibels, there would be a significant disturbance of normal outdoor speech.
While USA argues that the plaintiffs have produced no medical evidence of “real damage,” the jurisprudence does not limit real damage to physical injury. See and compare Rodrigue v. Copeland, supra. The frequent disruption of the plaintiffs’ sleep, combined with their worry, apprehension, stress, inconvenience, and loss of enjoyment of their property, are sufficient to constitute serious and material discomfort to persons of normal sensibilities in a normal state of health.
It is the duty of the trier of fact to weigh credibility and to accept or reject all or part of a witness’s testimony. Corder v. Lively, 39,780 (La.App.2d Cir.6/29/05), 907 So.2d 824. Where there is conflict in the testimony, reasonable evaluation of credibility should not be disturbed on appeal. Rosell v. ESCO, 549 So.2d 840 (La.1989). In this case, the trial court specifically stated that it found the testimony of the plaintiffs to be credible. The trial court observed that the majority of the defense witnesses had an economic interest in the outcome of the case or were racing fans. We do not find that the credibility determinations were manifestly erroneous.
laiThe plaintiffs have shown that the racetrack is unreasonably loud and operates on weekends from early evening into the early morning hours throughout the spring, summer, and fall. In addition, the racetrack operates intermittently for practices during other times of the week throughout the year. Although USA has taken measures to abate the noise and dust caused by the racetrack, the plaintiffs showed that the racetrack continues to disrupt their sleep and interferes with the use and enjoyment of their property. The plaintiffs who testified live on both sides of the racetrack and their complaints were all similar. Horne and Gowan testified that the dust aggravated their respiratory conditions. The noise prevents them from peacefully watching television, listening to music, or talking on the phone. Horne *1129 testified that he bought property in order to build a house, but the disruption caused by the racetrack has prevented him from doing so and has threatened the value of his investment in the land purchased. Gowan has two young children and their sleep is disrupted.
Prior to the construction of the racetrack, the area was a peaceful, quiet rural setting. Those qualities were the reason that Simmons moved to the area. The serenity previously enjoyed by the residents of the community has been destroyed by the noise created by the racetrack. Based upon the record in this case, we find that the trial court correctly concluded that the noise from the racetrack constituted an excessive and unreasonable nuisance that caused real damage and irreparable harm to the plaintiffs, not mere inconvenience. The trial court did not err in granting a permanent injunction in favor of the plaintiffs.
BURDEN OF PROOF
|aUSA argues that the trial court failed to apply the proper burden of proof in this matter. According to USA, the plaintiffs were required to provide strict proof and clear and convincing evidence that irreparable injury had been suffered. This argument is without merit.
Legal Principles
Since plaintiffs seek injunctive relief, they must prove irreparable injury in addition to the necessary showing of real damage under La. C.C. arts. 667-669. La. C.C.P. art. 3601; Rodrigue v. Copeland, supra. The standard of review for the issuance of a permanent injunction is the manifest error standard. The issuance of a permanent injunction takes place only after a trial on the merits in which the burden of proof is a preponderance of the evidence. Boggs & Poole Contracting Group, Inc. v. Caddo-Bossier Parish Port Com’n, 45,669 (La.App.2d Cir.11/3/10), 54 So.3d 1126; Metro Ambulance Service, Inc. v. Med Life Emergency Medical Services, Inc., 39,440 (La.App.2d Cir.3/17/05), 900 So.2d 184; State Machinery & Equipment Sales, Inc. v. Iberville Parish Council, 2005-2240 (La.App.1st Cir.12/28/06), 952 So.2d 77. See also Hughes v. Muckelroy, 97-0618 (La.App.1st Cir.9/23/97), 700 So.2d 995; Elysian Fields Church of Christ v. Dillon, 2008-0989 (La.App.4th Cir.3/18/09), 7 So.3d 1227.
Discussion
USA cites Dubos v. Dreyfous, 52 La.Ann. 1117, 27 So. 663 (1900), for the proposition that, in order to obtain an injunction against the racetrack, the plaintiffs were required to provide “strict proof.” The case of Robichaux v. Huppenbauer, 258 La. 139, 245 So.2d 385 (1971), required | ^strict proof that the activity carried on was of sufficient intensity, annoyance, and inconvenience that he who causes it has created a nuisance which must be abated.
In Guidry, the first circuit observed that in Hobson v. Walker, 41 So.2d 789 (La.App. 2d Cir.1949), this court stated that the appropriate burden of proof for obtaining an injunction is clear and convincing evidence, without citing authority for that proposition. However, as observed in Guidry, the subsequent supreme court cases of Salter v. B.W.S. Corp., Inc., 290 So.2d 821 (La.1974), held that an -action for an injunction under La. C.C. arts. 667-669 is controlled by La. C.C.P. art. 3601, and Rodrigue v. Copeland, supra, held that the burden of proof for a permanent injunction is a preponderance of the evidence. As set forth above, the jurisprudence now holds that the burden of proof for the issuance of a permanent injunction is a preponderance of the evidence. The trial court .did not err in applying that burden of proof in this case.
*1130 TAILORING THE INJUNCTION
USA contends that the trial court erred in granting a permanent injunction that was broad and all-encompassing, completely shutting down the racetrack. According to USA, the trial court should have crafted an injunction limited to the specific facts of the case. This argument is without merit.
Legal Principles
An injunction is an equitable remedy and should be carefully designed to achieve the essential correction at the least possible cost and ^inconvenience to the defendant. Hilliard, v. Shuff, 260 La. 384, 256 So.2d 127 (1971).
Discussion
USA claims that the trial court failed to narrowly tailor the injunction and provided no threshold noise level that would be acceptable. USA contends that the injunction prohibits any racing, regardless of noise level, and is overly broad, unduly burdensome, and essentially constitutes a taking of USA’s property.
USA cites Slavant v. Calhoun Motor Speedway, 626 So.2d 771 (La.App. 2d Cir.1993), in which an injunction against a speedway was tailored to specify that the business could not violate a parish ordinance by producing any sound of 100 decibels within 15 feet of any adjacent dwelling or business where people were present during the hours of 6:00 a.m. and 10:00 p.m. or any sound of 75 decibels within 15 feet of any adjacent dwelling or business where people are present during the hours of 10:00 p.m. and 6:00 a.m. In Slavant, this court merely noted the terms of the injunction and observed that the granting of the injunction had not been raised as an issue on appeal. The only issue on appeal concerned the appropriate monetary damages.
USA also cites Easterly v. Carr, 361 So.2d 279 (La.App. 1st Cir.1978), in which the trial court issued a permanent injunction against the defendant and all other persons from riding excessively noisy motorbikes on his property. The first circuit affirmed the granting of the injunction, but amended it to provide that only the defendant, against whom the suit was brought, was prohibited from creating or allowing others to create 1 ^unreasonably excessive noise by the riding of unmuffled or insufficiently muffled motorcross bikes or trail bikes on his property.
In this case, USA has failed to show how the trial court could have constructed a more limited injunction. Hobson testified regarding the extensive measures he took to abate the noise and dust, including lowering the race track, constructing berms around it, putting up a sound wall, erecting barriers, planting pampas grass and trees, requiring mufflers on the cars, and wetting down the track to reduce dust. When asked if he had any future plans for improvements to the racetrack, Hobson stated, “I don’t know what I could do.” Sound readings by Verret, USA’s sound expert, were made after noise abatement measures were taken and reflect sound levels that were disruptive to the community. The plaintiffs testified that the noise was not abated by Hobson’s improvements. These factors demonstrate that there was no way the trial court could have more narrowly tailored the injunction in this case. We also note that USA is not prohibited from operating any legal business whatsoever upon its property. It is only enjoined from operating a commercial car racetrack with its attendant excessive noise which causes real damage and irreparable harm to the plaintiffs. Based upon the facts presented here, we find that the permanent injunction issued by the trial court was not overly broad.
*1131 CONCLUSION
For the reasons stated above, we affirm the judgment of the trial court permanently enjoining USA Speedway, LLC, from operating a commercial racetrack at its location in Union Parish, Louisiana. Costs in this court are assessed to USA Speedway, LLC.
[¡^AFFIRMED.

. In an amended petition, the 59 plaintiffs were listed as follows: Fred Badke, Resha Badke, Emma Davis, Lee Roy Day, Carolyn Fuller, Adrienne Gowan, Monica Horne, Greg Horne, Joyce Pringle Howie, Scott Howie, Valencia L. Hunter, Yvette Hunter, Shalonda Lamb, Patricia Moss, Betty M. McDougle, Billie T. McDougle, Jimmy D. Nettles, Roy McPherson, Jr., Loretta McPherson, Edwin W. Hunter, Tina X. Hunter, Kevin W. Armstrong, Rebecca Armstrong, Mark Davis, Key-tha Davis, EJ. Simmons, Patón D. Parks, III, Jule W. Parks, Flora Jeanette Davis, Elaine M. Haynes, Sophie Mitchell, Rosemary Mitchell, Latonya Mitchell, Edgar W. Haynes, Shenei-sha D. Haynes, Kalisha Davis, Amos McCul-ler, Chris Gowan, Sue Pitarra, Chad Pitarra, Doris Brown, Wilma Davis, Sharon Flintroy, Kimberley Flintroy, Wesley Flintroy, Reginald Staten, Katherine Douglas, Latoya Mitchell, Benjamin Henderson, Marquis Douglas, Michael Douglas, Della R. Benson, Geuecal William, Sr., Roy Benson, Charles Carr, George Allen, Jr., Jammie Flintroy, Wilber Flintroy, Clenton Baker.
Also in the amended petition adding additional plaintiffs, Billie T. McDougle, Jimmy D. Nettles, Lee Roy Day, Tina L. Hunter, Edwin Hunter, and Yvette Hunter claimed that the defendants or their representatives threatened and intimidated some of the plaintiffs to dismiss their claims.
A plaintiff in the original petition, Maxine Hollis, dismissed her claims without prejudice prior to the filing of the amended petition. Jimmy D. Nettles and Kevin W. Armstrong subsequently dismissed their claims against the defendants without prejudice.

. The plaintiffs argued that Union Parish Ordinance 10-8 on noise was applicable to this case. The trial court disagreed, finding that the ordinance was aimed at stereos, audio devices and noise-producing instruments designed to produce noise, not car engines. The applicability of that ordinance is not before this court on appeal.