**Henry St. Paul PROVOSTY and Gloria Newman Provosty**

v.

**ARC CONSTRUCTION, LLC, et al.**

NO. 2015-CA-1219

Court of Appeal of Louisiana, Fourth Circuit.

NOVEMBER 2, 2016

Rehearing Denied December 9, 2016

Lena D. Giangrosso, PROVOSTY & GANKENDORFF, L.L.C., 650 Poydras Street, Suite 2700, New Orleans, LA 70130, Lloyd N. Shields, Adrian A. D'Arcy, Jessica R. Derenbecker, SHIELDS MOTT LUND L.L.P., 650 Poydras Street, Suite 2600, New Orleans, LA 70130, COUNSEL FOR PLAINTIFFS/APPELLANTS

Stephen D. Marx, CHEHARDY SHERMAN WILLIAMS MURRAY RECILE STAKELUM & HAYES, LLP, One Galleria Boulevard, Suite 1100, Metairie, LA 70001, COUNSEL FOR DEFENDANT/APPELLEE

(Court composed of Chief Judge James F. McKay, III, Judge Dennis R. Bagneris, Sr., Judge Edwin A. Lombard, Judge Daniel L. Dysart, Judge Joy Cossich Lobrano)

Judge Edwin A. Lombard

Appellants Henry and Gloria Provosty ("the Provostys") seek review of two district court judgments on appeal: a March 13, 2012 judgment granting defendant Icehouse Capital Management, LLC ("Icehouse"), a new trial, and a September 2, 2015 judgment holding that the corporate veil of defendant ARC Construction, L.L.C. ("the ARC"), should not be pierced as to Icehouse through its managing member Marc Winthrop. After converting the Provostys' appeal to an application for supervisory writs, which we grant, we affirm the district court judgments finding that the district court did not abuse its discretion in granting Icehouse a new trial, and further finding the district court judgment regarding piercing the corporate veil as to Icehouse was not manifestly erroneous or clearly wrong.

**Procedural History**

The instant appeal arises from a contract dispute between the Provostys and and the ARC, of which Icehouse is a member.[1] Following Hurricane Katrina, contractors from Missouri and investors from New York formed the ARC in Louisiana. The Missouri contractors are Hyun Sung, Christopher P. Schmitt, Jamey Schmitt,[2] and Richard Drevet, who are members of Missouri construction-company American Restoration Contractors, LLC ("ARC-MO"). The New York investors are Icehouse, Errol Glas-

---

1. The facts and the majority of the procedural history of the instant contract dispute were set forth in our previous opinion, *Provosty v. ARC Const., LLC*, 12–1015 (La.App. 4 Cir. 3/20/13), 119 So.3d 23.

2. Christopher and Jamey Schmitt will hereinafter be referred to collectively as "the Schmitts." Their surname is also spelled as "Schmidt" in the record.

ser and Kestenbaum & Associates, LLC ("Kestenbaum").[3] Mr. Winthrop, as previously mentioned, is the managing member of Icehouse.

The Provostys contracted with the ARC to build a new home for them in Orleans Parish for $607,693.10. Soon thereafter, however, the Provostys encountered numerous construction setbacks and disputes with the ARC regarding the progress of the construction of their home. On April 3, 2008, the Provostys filed suit against the ARC, the ARC-MO, and all of its members for negligence, bad faith breach of contract, misrepresentation, misappropriation of funds, fraud and violations of the Louisiana Unfair trade Practices Act ("LUP-TA"). Two ARC-MO employees were also sued. The Provostys later filed amending petitions seeking to hold all of the defendants solidarily liable under the "piercing the corporate veil/alter ego" doctrine on the basis of fraud and undercapitalization.

A jury trial[4] was held in early 2011, resulting in a jury verdict awarding the Provostys $213,984.16 for out-of-pocket costs and expenses to complete construction of the house, $25,000 for additional rental, insurance, transportation and inconvenience costs, as well as $300,000 for emotional and mental anguish. *Provosty*, 12–1015, pp. 2–3, 119 So.3d at

27. On June 24, 2011, the district court rendered judgment finding that Icehouse, as well as other defendants, were solidarily liable to the Provostys for damages totaling $852.998.78. The judgment also dismissed Kestenbaum and Mr. Glasser with prejudice.[5] *Id.*, 12–1015, p. 4, 119 So.3d at 28.

Thereafter, Mr. Winthrop, on Icehouses's behalf, filed a motion for new trial asserting that juror confusion was potentially caused by an erroneously-worded jury interrogatory. The district court later rendered a second amended judgment on March 13, 2012, granting the motion for new trial,[6] reducing an emotional and mental anguish award of the Provostys from $300,000 to $10,000 per plaintiff, denying the Provostys' motion for new trial on the issue of attorney's fees and denied the parties sanctions.

The Provostys filed an appeal in this Court in May 2012 seeking review of the district court's reduction of the jury award for emotional and mental anguish and for its dismissal of two defendants from the underlying case, in case number 2012-CA-1015. We reinstated the jury award and affirmed the judgment of the trial court in all other respects. *Provosty*, 12–1015, p. 31, 119 So.3d at 43. We further

3. These three members of the ARC are also members of Triangle Capital, LLC, in New York.

4. Prior to trial, the Provostys claims against Kestenbaum were dismissed by the district court on directed verdict.

5. The ARC, ARC–MO, the Schmitts, and Mr. Drevet filed a reconventional demand against the Provostys for legal malpractice resulting from Mr. Provosty's representation of the ARC when it began doing business in Louisiana. On July 22, 2011, the trial court amended its judgment to include the disposition of the legal malpractice claim against defendant-in-reconvention, Mr. Provosty, which

was dismissed. The district court awarded him attorney's fees, costs and expenses incurred. Consequently, the Provostys' prior award increased to $858,736.87. *Id.*, 12–1015, p. 6, 119 So.3d at 29.

6. The Provostys explain that they were unable to appeal the new trial granted by the district court as to Icehouse until after the new trial was held and a verdict was rendered pursuant to *Marciante v. Marciante*, 12–569, p. 6 (La. App. 5 Cir. 3/27/13), 113 So.3d 387, 390 (*citing E. Solutions, Inc. v. Al–Fouzan*, 12–464 (La.App. 3 Cir. 11/7/12), 103 So.3d 1190, 1192, *writ denied*, 12–2623 (La. 1/25/13), 105 So.3d 721).

noted that Icehouse had been granted a new trial and pretermitted discussion of Icehouse's assignments of error. *Id.*, 12–1015, pp. 32–33, 119 So.3d at 44.

Later, a bench trial was held as to the individual liability of Icehouse, through Mr. Winthrop, for the fraud perpetrated against the Provostys. The district court rendered a judgment in September 2, 2015, in favor of Icehouse dismissing it from all liability. The Provostys timely filed their motion for appeal.

## CONVERSION OF APPEAL TO AN APPLICATION FOR SUPERVISORY WRITS

■ Prior to addressing the Provostys' assignments of error, we first address a procedural issue involving one of the judgments of the district court. The September 2, 2015 judgment for which the Provostys seek review is not a final appealable judgment because it lacks the required decretal language stating the party against whom the judgment was rendered. *See* La. Code Civ. Proc. Art. 1841, and *Bd. of Sup'rs of LSU v. Mid City Holdings*, 14–0506, pp. 2–3 (La.App. 4 Cir. 10/15/14), 151 So.3d 908, 910.

In said judgment, the district court states that the judgment is rendered in Icehouse's favor and that it is dismissed from all liability with prejudice, but mentions nothing about the dismissal of the Provostys' claims against Icehouse.

In *Bd. of Sup'rs of LSU, supra*, we explained that a final appealable judgment must contain decretal language:

"A final judgment shall be identified as such by appropriate language." La. C.C.P. Art. 1918. " 'A final appealable judgment must contain decretal language, and it must name the party in favor of whom the ruling is ordered, the party against whom the ruling is ordered, and the relief that is granted or

denied.' " *Palumbo v. Shapiro*, 11–0769, p. 5 (La.App. 4 Cir. 12/14/11); 81 So.3d 923, 927, quoting *Input/Output Marine [Systems, Inc. v. Wilson Greatbatch, Technologies, Inc.]*, 10–477, p. 13; 52 So.3d [909] at 916 [ (La.App. 5 Cir. 2010) ]. "The specific relief granted should be determinable from the judgment without reference to an extrinsic source such as pleadings or reasons for judgment." *Input/Output Marine*, 10–477, p. 13; 52 So.3d at 916.

*Id.*, 14–0506, pp. 2–3, 151 So.3d at 910.

■ We note that the Provostys' motion for appeal was filed within 30 days of the judgment, which is within the time period for the filing of an application for supervisory writs. Therefore, we will exercise our discretion and convert their appeal to an application for supervisory writs, which we grant.

## ASSIGNMENTS OF ERROR

The Provostys raise two assignments of error:

1. The district court erred by granting Icehouse's Motion for New Trial when there was no evidence of jury confusion or a material effect on the verdict, and

2. The district court committed legal error in its misapplication of the *Bossier* factors and in finding no liability on Icehouse's part despite substantial evidence of its liability.

## GRANT OF MOTION FOR NEW TRIAL

■ In its first assignment of error, the Provostys argue that the district court committed legal error in finding that Icehouse should be granted a new trial based upon its finding that the jury was given improper jury instructions. Consequently, they assert that this portion of the judg-

ment should be overturned, and the original jury verdict reinstated.

The Provostys urge that the instructions correctly stated the substance of the law. The sole issue the district court identified with the jury instructions was whether Jury Question 14 may have potentially confused the jury's interpretation of the facts of the case, but not the law to be applied, they argue. They further point out that at trial, jurors are the factfinders and must decide which facts have been proven. Jury Question 14 queried whether the members, managers, or agents of the ARC-MO, including Icehouse, defrauded the Provostys. This interrogatory was erroneously worded as Icehouse was not a member of the ARC-MO.

The Provostys make the following arguments in support of the reversal of Icehouse's grant of a new trial:

1. No evidence was presented at either trial demonstrating that Icehouse had a relationship with the ARC-MO. Moreover, all evidence presented at the initial trial evidenced that Icehouse was not a member, including Mr. Winthrop's testimony;

2. When reviewed in its totality, the jury questionnaire reflects that no juror confusion existed. Moreover, the jury constantly and consistently found Icehouse and the ARC defendants committed fraud and other tortious acts against the Provostys;

3. Jury question 14 also misidentified Mr. Glasser as a member of the ARC-MO, but the jury did not find Mr. Glasser committed fraud evidencing that there was no actual jury confusion. Additionally, in Jury Question 11, the jury was asked whether Messrs. Winthrop (Icehouse), Glasser and others defrauded the Provostys as members of the ARC. Once again the jury found that Icehouse had act-

ed to defraud them, but not Mr. Glasser. This indicates that the jury was aware of the roles that the various members and entities played in this matter. The verdict of the jury was consistent in this instance and in finding that Icehouse, via Mr. Winthrop, and the ARC defendants committed fraud and other tortious acts against them. The jury determined that Icehouse was liable for certain damages under LUTPA, while excluding Mr. Glasser.

4. Counsel for Icehouse conceded after the initial trial that there was no prejudice or confusion because question 14 "was excess" and "doesn't matter" in light of the other jury questions and the verdict awarded by the jury;

5. Even if there was jury confusion, the confusion had to be substantial enough to mislead the jury "to the extent that it was prevented from dispensing justice." *Adams v. Rhodia, Inc.*, 07–2110, p. 7 (La. 5/21/08), 983 So.2d 798, 804. Such was not the case in the instant matter because the jury determined that Icehouse defrauded the Provostys as a member of the ARC and that the ARC members acted together in defrauding them. The jury had already determined in Jury questions 10 through 12 that the ARC had defrauded them, that Icehouse was a member, manager or agent of the ARC and that the members of the ARC had acted together.

6. The district court's June 2011 judgment specifically stated: "there is no doubt in this Court's mind that the jury found that ... Icehouse Capital [Management], LLC through its Managing Member Marc Winthrop were heavily involved in ARC-La's [the ARC's] shell game and in defrauding their customers and that

this alone warrants the piercing of the corporate veil." Nevertheless, the district court granted the motion for new trial.

 "The trial court also has wide discretion when deciding whether to grant a new trial. La. C.C.P. Art. 1973. Therefore, we review the denial of a new trial by applying the abuse of discretion standard." *Robertson v. Lafayette Ins. Co.*, 11–0975, p. 8 (La.App. 4 Cir. 2/8/12), 85 So.3d 186, 191 [citations omitted]. However, when a legal error has restricted or interdicted the fact-finding process, the abuse of discretion standard no longer applies, and we apply a *de novo* standard of review. A legal error exists upon the application of incorrect principles of law that deprives a party of substantial rights. *Evans v. Lungrin*, 97–0541, 97–0577, p. 7 (La. 2/6/98), 708 So.2d 731, 735.

 A new trial may be granted for either peremptory or discretionary grounds. La. Code Civ. Proc. Art. 1972, lists the peremptory grounds for granting a new trial:

A new trial shall be granted, upon contradictory motion of any party, in the following cases:

(1) When the verdict or judgment appears clearly contrary to the law and the evidence.

(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.

(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.

However, under La. Code Civ. Proc. Art. 1973, a new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.

In the instant matter, the district court did not specify whether it was granting a new trial on peremptory or discretionary grounds. However, given its explanation that there may have been juror confusion, the district court appears to have granted the new trial on discretionary grounds.

Icehouse contends that the issue here does not lie with the jury instructions, but with whether the jury was confused as to Jury Question 14. We agree. Icehouse alleged and the district court only notes the potential for jury confusion. There is no allegation or indication of actual juror confusion. The record is also silent as to whether the district court investigated if there was proof of juror confusion from the record, the interrogatories, questions submitted by the jury, and/or its observations of the jury at trial.

Moreover, in its June 23, 2011 Judgment, we note the district court recounted the following fact-findings of the jury with regard to Icehouse:[7]

1. It defrauded the Provostys as a member of the ARC and acted together with the Schmitts, Mr. Drevet, Mr. Sung, and an ARC-MO employee, Matt LaMora in so doing;

2. It defrauded the Provostys as a member of the ARC-MO with the Schmitts, Mr. Drevet and Mr. LaMora;

3. Evidence was presented that would disregard the corporate veil under an alter ego theory in regards to the ARC, but not the ARC-MO. Therefore, the corporate veil was held to be specifically disregarded as to the Schmitts, Mr. Drevet, Icehouse as well as Mr. LaMora; and

**7.** The jury verdict form and interrogatories were not included in the record. However, the parties stipulated as to the jury's findings, which were also recounted by the district court in its June 23, 2011 Judgment.

4. It, as well as the Schmitts, Mr. Drevet, Mr. LaMora, the ARC and the ARC-MO, violated LUTPA.

Furthermore, as we noted in the earlier appeal and as the Provostys point out, the district court explained in its June 2011 judgment that "there is no doubt in this Court's mind that the jury found that . . . Icehouse" was "heavily involved in ARC-La's [the ARC's] shell game and in defrauding their customers and that this alone warrants the piercing of the corporate veil."

There was clearly an error in identifying Icehouse as a member of the ARC-MO. It is equally apparent that the jury identified Icehouse as being a party to defrauding the Provostys as a member of the ARC and as having violated LUTPA. However, we cannot say that the district court abused its discretion in granting Icehouse a new trial due to the erroneous jury interrogatory. There existed the possibility that the fact-finding process was tainted against Icehouse as a result of the error. While another trier of fact may have reached a different conclusion, we cannot say that the court abused its discretion in granting Icehouse a new trial and do not find that the trial court committed a legal error in so doing.

## LEGAL ERROR IN *BOSSIER* ANALYSIS AND APPLICATION

■ In their remaining assignment of error, the Provostys aver that the district court committed legal error in its analysis and application of *Bossier Mill Work & Supply Co. v. D. & R. Const. Co.*, 245 So.2d 414 (La. App. 2nd Cir. 1971), which the district court found inapplicable to pierce the corporate veil of the ARC as to Mr. Winthrop. The Provostys maintain that pursuant to *Bossier*, a member of a corporation can be held individually liable for fraud through the theory of piercing the corporate veil, when he or she had equal authority and participation in the management of the financial affairs of the corporation, knew of the fraud or deceit being practiced upon a third party and profited from said fraud.

Mr. Winthrop, they aver, had differing levels of involvement in the ARC considering that he admittedly acted as the liaison for the New York investors to the company, and was the managing member of Icehouse, which was one of seven members of the ARC. The Provostys contend that he played a more central role in the management of the company, through which he allegedly committed two types of fraud against them: 1) making a series of material misrepresentations concerning its licensing status, financial stability, building experience, and record of timely job completion to homeowners and potential homeowners; and, 2) demanding payments not yet due from them to pay other bills.

Regarding the latter claim, the Provostys aver that he was intimately and directly involved in "systematically misappropriating customer money to pay expenses unrelated to their projects." They contend that Mr. Winthrop played a central role in the creation, financial management, and marketing of the company. They cite the following examples of his participation in and control of the fraud:

- His involvement in all legal aspects of the LLC, including the drafting of the Operating Agreement;
- Receipt of weekly financial performance updates of the company from Mr. Drevet and maintaining the ARC's bank account;
- Being named as a managing member and reviewing and negotiating the lease agreement;
- Awareness that in December of 2005, the company was not licensed in general contracting;

- His awareness that the company was collecting payments on construction projects, including the Provostys, for construction the company had not performed and using the payments to pay other expenses;
- His involvement in the company attaining its remodelers' license; and,
- His preparation and review of marketing and investment materials which misrepresenting the ARC's capabilities, including promoting the company as having experience in new residential construction, when it did not as well as representing the company as a "'licensed, full service' contractor". Furthermore, he was listed as a contact person on the marketing materials.

In support of these claims, they rely upon the testimony of various employees of the ARC. For instance, Leslie Yarborough, the project manager for the ARC, and Tiffany Street, the ARC's sales manager, testified that Mr. Winthrop was up-

dated at least weekly on the financial performance of the company and that he had an active role in running the company.

The district court, however, was unconvinced of Mr. Winthrop's liability under *Bossier*. It also held that there was a lack of proof of fraud, so as to hold Mr. Winthrop personally liable under the fraud exception under La. R.S. 12:1320(D).[8] $\lfloor_{12}$*See Ogea v. Merritt*, 13–1085, p. 12 (La. 12/10/13), 130 So.3d 888, 898.[9] In its Written Reasons, the district court explained that *Bossier* was factually distinguishable from the instant matter:

> This Court does not find that plaintiffs have proven that Winthrop exercised equal decision-making power and participation in ARC-LA, nor have they proven that Winthrop had knowledge of the fraud committed by members of ARC-LA. In addition, upon further review of *Bossier* and subsequent case law, this Court agrees with the Defendant's analysis of the applicability to *Bossier* to this

**8.** La. Rev. Stat. 12:1320, entitled *Liability to third parties of members and managers*, provides:

A. The liability of members, managers, employees, or agents, as such, of a limited liability company organized and existing under this Chapter shall at all times be determined solely and exclusively by the provisions of this Chapter.

B. Except as otherwise specifically set forth in this Chapter, no member, manager, employee, or agent of a limited liability company is liable in such capacity for a debt, obligation, or liability of the limited liability company.

C. A member, manager, employee, or agent of a limited liability company is not a proper party to a proceeding by or against a limited liability company, except when the object is to enforce such a person's rights against or liability to the limited liability company.

D. Nothing in this Chapter shall be construed as being in derogation of any rights which any person may by law have against a member, manager, employee, or agent of a

limited liability company because of any fraud practiced upon him, because of any breach of professional duty or other negligent or wrongful act by such person, or in derogation of any right which the limited liability company may have against any such person because of any fraud practiced upon it by him.

**9.** The district court had already found that Mr. Winthrop was not guilty of fraud, under La. Civ. Code Art. 1953, et seq., mainly because he acted primarily as an investor in the ARC, and the Provostys did not "present evidence that Winthrop had knowledge that the ARC-LA was taking the Provostys money and not giving the Provostys an equal amount of construction value." The Court also concluded that Mr. Winthrop had no reason to believe the ARC was going to fail at the time the Provostys entered into their contract. Fraud, which may result from silence or inaction, is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. La. Civ. Code Art. 1953.

case and therefore this Court does not find any liability on the part of Icehouse pursuant to *Bossier*.

▨ Appellate courts review a trial court's factual findings under the manifest error/clearly wrong standard of review. *Hall v. Folger Coffee Co.*, 03–1734, p. 9 (La. 4/14/04), 874 So.2d 90, 98. Furthermore, "[e]ven though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La. 1993).

▨ However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. *Evans v. Lungrin*, 97–0541, 97–C–0577, pp. 6–7 (La. 2/6/98), 708 So.2d 731, 735.

In *Bossier*, Bossier Millwork Supply filed suit against D. & R. Construction Company, Inc., to recover monies and to have a materialmen's lien enforced against property the defendant construction company built a home upon and sold. American Title Insurance Company, the company that issued a title insurance policy to the mortgagee of the property—Bossier Bank & Trust Company—intervened in the suit to challenge the plaintiffs' claims and filed a third party claim against the defendant as well as the shareholders who formed the defendant construction compa-

ny, John R. Duncan and Kenneth N. Roberts.[10]

Mr. Duncan appealed the district court's judgment finding that he was personally liable with the defendant company to American. The Second Circuit affirmed the district court judgment, under La. Rev. Stat. 12:95, finding him personally liable because he acted in concert with Mr. Roberts in deceiving American thereby causing it to act to its detriment "based on the representation that no bills were outstanding in the construction of the residence on the property insured." As a prerequisite to the issuance of the policy of title insurance, Mr. Roberts "signed a lien affidavit making an oath to the effect that all charges and costs for labor performed, material furnished and fixtures installed on the premised were paid for in full and that the premises was free and clear of all claims which would give rise to a lien."

The Second Circuit explained that although Mr. Duncan did not execute the affidavit, he was liable nonetheless due to his high level involvement in the management of the defendant company, his knowledge of the financial predicament of the construction project and his receipt of funds from the sale of the property. The Second Circuit explained:

> ... the facts as we understand them lead to the conclusion that Duncan had equal authority and participation in the management of the financial affairs of their venture and knew that the sale and mortgage transaction would be consummated at the appointed time. With his knowledge of the circumstances of the financial plight of the construction project, he was under an equal duty with Roberts to advise the attorney who rep-

---

**10.** Messrs. Duncan and Neal formed D. & R. Construction Company, Inc. The articles of incorporation reflected an authorized capital of 1000 shared of no par value stock, of which 490 shares were issued to each of them. The remaining 20 shares were issued to the wives of both men.

resented American Title Insurance that all bills had not been paid. The willful action of Duncan in participating in the receipt and distribution of funds derived from the transaction renders him equally guilty of the deceit practiced on third party plaintiff. Having done so, Duncan may not use the corporate entity as a shield from personal responsibility.

*Bossier*, 245 So.2d at 417.

Furthermore, in the instant matter, the parties stipulated to numerous facts prior to trial, including the following, prior to the bench trial:

- Mr. Winthrop was the contact person for the New York members of the ARC and received financial reporting documents on a weekly or bi-weekly basis, which he shared with the other New York members. He also had electronic access to view the ARC's bank account and, initially, bank account statements were sent to him.

- In June 2006, Icehouse was one of seven managing members of the ARC. Furthermore, Icehouse's membership in the ARC was 15%.

- Erin Grunberg, the bookkeeper for the ARC, testified that Mr. Winthrop was not in New Orleans running the ARC on a day-to-day basis, but Mr. Drevet was.

- In September 2006, Mr. Winthrop was informed by Mr. Drevet that the ARC was failing to bring in jobs on time and on budget.

- Beginning in the fall of 2006, Ms. Street began sending Mr. Winthrop "Finance Forecast Reports" and "Pipeline Reports" showing revenue that the ARC expected to collect.

- Mr. Drevet showed the Provostys pictures of houses that the ARC-MO members allegedly built in Missouri to entice the Provostys to retain the ARC. He further e-mailed Ms. Street in November 2006, noting that Mr. Provosty had "$ $ $ to burn" on their construction project. The Provostys subsequently contracted with the ARC.

- Misses Grunberg and Yarborough testified that Mr. Winthrop called employees of the ARC to find out when money might be coming in to the company.

- Ms. Grunberg testified that in early 2007, Mr. Winthrop inquired of her as to when the Provostys would make their second construction project payment. Around this time, however, the only work that had been performed on the Provostys' home was pile driving.

- Mr. LaMora took over the day-to-day operations of the ARC from Mr. Drevet in February 2007.

- "Icehouse was never repaid any of the money it advanced and never received any return on the investment, or reimbursement for any travel or other out-of-pocket expenses." The stipulations reflect that Icehouse's investment in the ARC was approximately $150,000.

We find that liability under *Bossier* extends to individual shareholders who know of the fraudulent acts of other shareholder(s), equally participated in the management and decision-making of the company and profited as a result. Based upon the foregoing stipulations and the testimony adduced at trial, we agree with the district court in finding that the facts of *Bossier* are distinguishable from the matter *sub judice*. The district court heard conflicting testimony as to whether Mr. Winthrop was involved in the day-to-day management of the ARC; however, the court resolved that he was not and that he was not physically present at the ARC to have been involved in the daily management of the corporation. Where there is conflict in the testimony, reasonable evalu-

ation of credibility should not be disturbed on appeal. *Badke v. USA Speedway, LLC*, 49,060, p. 20 (La.App. 2 Cir. 5/14/14), 139 So.3d 1117, 1128 *[subsequent procedural hist. omitted] (quoting Rosell v. ESCO*, 549 So.2d 840 (La.1989)).

Additionally, neither the testimony adduced at trial nor the stipulations indicate that fraud perpetrated against the Provostys by other members of the ARC was communicated to Mr. Winthrop, or that he directly acted to defraud the Provostys. His inquiries into payments made by the Provostys coupled with the financial updates he received on the ARC's financial status, do not equate to fraud on his part or knowledge of fraudulent activity committed by any of the other ARC members and/or employees. Lastly, Mr. Winthrop, via Icehouse, did not profit from the Provostys being defrauded, as mentioned in the stipulations. For these reasons, we find that this assignment of error is without merit, and the district court's judgment is neither manifestly erroneous nor clearly wrong.

### DECREE

For the foregoing reasons, having converted the appeal of Henry and Gloria Provosty to an application for supervisory writs, which we grant, we affirm the March 13, 2012 judgment and the September 2, 2015 judgment of the district court.

**APPEAL CONVERTED TO APPLICATION FOR SUPERVISORY WRITS; WRIT GRANTED; AFFIRMED.**

LOBRANO, J., CONCURS IN PART AND DISSENTS IN PART.

I respectfully dissent. As I have previously expressed in *Provosty v. ARC Const., LLC*, 2012–1015 (La.App. 4 Cir. 3/20/13), 119 So.3d 23, I agree with the majority in affirming the March 13, 2012 judgment granting Icehouse a new trial. However, I would find that the district court erred in its September 2, 2015 judgment dismissing Icehouse from all liability in this matter.

McKAY, C.J. DISSENTS WITH REASONS

I respectfully dissent from the majority's opinion affirming the trial court's March 13, 2012 judgment granting a new trial in favor of defendant, Icehouse Capital Management, LLC ("Icehouse"), and the September 2, 2015 judgment dismissing Icehouse from all liability in this matter. For the reasons set forth below, I find that the trial court erred.

Regarding the trial court's granting of a new trial, I find that the record fails to demonstrate any confusion on the part of the jury. In answering numerous questions pertaining to Icehouse and Mr. Winthrop, the jury consistently found that Mr. Winthrop committed fraud against the plaintiffs. Thus, I find that the trial court erred in granting a new trial on the basis of possible jury confusion. Moreover, after a review of the record, I find that the jury's verdict regarding Mr. Winthrop's fraud is supported by the evidence presented. Accordingly, I would reverse the trial court's judgments and reinstate the jury verdict.